Leahy vs. The National Building & Loan Association.

For the respondent there was a brief by *Edwin S. Mack* and *Nath. Pereles & Sons,* attorneys, and *C. F. Hunter,* of counsel, and oral argument by *Mr. Hunter.*

LEAHY vs. THE NATIONAL BUILDING & LOAN ASSOCIATION —
     IN RE PETITION OF LANGWORTHY: IN RE PETITION OF
     EGGLESTON: IN RE PETITION OF WHITE and another.

*September 21 — October 11, 1898.*

*Building and loan associations: Mutual profit sharing: Insolvency: Validity of stock:* Ultra vires: *Estoppel: Abrogation of contracts: Who are members: Distribution of assets: Liability for losses: Preferences.*

| | |
|---|---|
| 100 | 555 |
| 105 | 360 |
| 100 | 555 |
| 107 | 386 |
| 100 | 554 |
| s110 | 548 |
| 100 | 555 |
| 114 | ⁵225 |
| 114 | 226 |
| 100 | 555 |
| 59 LRA | 746 |
| 59 LRA | 748 |

1. A corporation organized for the purpose of accumulating funds by monthly contributions of its members, making loans to its members and stockholders, and making other investments, made changes from time to time in its articles of organization and issued stock on different schemes and plans, but its paramount theory was always akin to that of the ordinary building and loan association, the profits to be paid to members of all classes being those to be derived from interest earnings, fines, etc., and from *no other source,* and it finally became a regular building and loan association under the laws of this state. *Held,* that it was a mutual profit sharing institution, and that, upon its becoming insolvent, the rights and

relations of its members and stockholders must be defined and determined on that basis.

2. Such an association issued "definite contract stock," for which the holder was to pay in fixed monthly instalments for a certain number of months, and "full-paid stock," for which the holder paid a certain number of instalments in advance, less a rebate, the company agreeing in each case to pay to the holder a definite amount at a given time, regardless of whether the anticipated profits had then been earned or not. *Held*, that neither the members accepting such stock nor the receiver of the association, after it has become insolvent, can question the validity of such stock on the ground that its issue was *ultra vires*.

3. Upon the insolvency of such an association all contracts between it and its members are abrogated; the duty of members to make stock payments ceases; and borrowing members may be compelled to pay forthwith the balances due from them on their securities, although the latter in terms provide only for payment in instalments.

4. The insolvency of such an association is fatal to a stipulation in stock certificates to the effect that the shareholder assumes no liability of any kind except as therein stated, as well as to the other terms of the contract, and each member must bear his proportionate share of the losses.

5. A borrowing member of such association does not, by assigning his stock to the association as collateral security, cease to be a member or to be liable to contribute as such to the losses and expenses of the association.

6. Upon the insolvency of the association a borrowing member should be charged with the amount of his loan at legal interest, and credited with all interest payments made by him, on the principle of partial payments; and upon payment of the balance found due will be entitled to a release of his mortgage. Stock payments should not be credited on the mortgage debt, but the amount due to the member upon the stock will be ascertained and paid in the final distribution, as to other members.

7. The fact that a borrowing member has died and that other persons have become the owners of the mortgaged land, subject to the mortgage, does not change the situation or give the new owners any greater rights than the member would have had had he lived.

8. A holder of "full-paid stock" is a member of the association, notwithstanding a provision in his stock certificate to the effect that he shall not have any claim or interest in the affairs, assets, or funds of the association, or the control of them, except his right to pay-

ment of the maturity value of his stock at the time fixed, and that he assumes no liability of any kind whatsoever except as therein stated; and, being such member, he is entitled to no preference over other members when the association becomes insolvent, in the absence of anything in the charter or by-laws giving such a preference.

APPEALS from orders of the superior court of Milwaukee county: GEO. E. SUTHERLAND, Judge. *Reversed.*

This action was brought by the plaintiff, as a stockholder and creditor of the defendant, for the purpose of winding up its affairs, and such proceedings were had that on March 11, 1897, *Martin W. Sherman* was appointed receiver. On October 14, 1897, the receiver filed his petition for instructions, in which he set out at length the prior transactions of the company, and asked the court for instructions regarding priority of claims of members against the company, and as to his duty in reference thereto.

The receiver's petition sets out that from the time of the organization of the association, May 10, 1887, to August 2, 1895, it issued different classes of shares of stock: some called "100-months stock," according to the terms of which the member was to pay monthly instalments of seventy cents each for 100 months, and the association agreed to pay him $100 per share; other stock was issued, called "ninety-six months stock," which was to mature in ninety-six months; still another class was "full-paid stock," where the members paid ninety-six instalments of seventy cents each, in advance, less a rebate of $9 allowed for interest, and at the expiration of ninety-six months the association was to pay the holder $100 per share. By article 10 of the by-laws, each member holding shares of the ninety-six or one hundred months stock was entitled to a loan from the association of $100 for each share of stock held by him as follows: The stockholder was prepaid at the time his loan was made the full amount of $100 per share, upon his executing to the association a

bond conditioned to promptly pay the instalments due on
his stock, and interest on the face of his stock at ten per
cent. in monthly instalments for the time the stock was to
run, and also upon executing a mortgage on real estate con-
ditioned for the performance of the conditions of the bond.
The stock was also assigned to the association as additional
security. The petition sets out that other classes of stock
were issued, and other complications had arisen, concerning
which he desires instructions, but which are not material to
the questions here involved.

Upon presentation of this petition, the court made an
order fixing a time and place for a hearing. Notice was
given to all parties interested, and on the day appointed
several parties intervened with petitions setting out their
rights and interests in the association, and asking the court
to determine their respective rights in the premises. The
receiver made answer to the respective petitions, and the
court made findings and entered orders establishing and
defining their rights as hereinafter set forth.

*Catherine Langworthy's petition:* As to the issue presented
on the petition of *Catherine Langworthy*, the court found
substantially as follows: On April 7, 1890, the petitioner
made a written application for twenty shares of ninety-six
months stock, which stock was issued May 1, 1890. At the
date of her application for stock, she also applied for a loan
upon her stock of $2,000. The loan was approved, and the
required bond and mortgage was delivered, conditioned to
pay to the association the said sum of $2,000 in monthly in-
stalments of $14, with ten per cent. interest monthly from
May 1, 1890, to May 1, 1898, and the stock certificate was
also assigned to the association. Petitioner paid the monthly
instalments on the stock until the receiver was appointed,
making eighty-two payments in all. Under the contract of
membership, the association agreed that if petitioner would
pay the monthly instalments of $14, and all fines, member-

ship fees, and charges for ninety-six months, then it would pay her $100 for each share of stock held by her, which would include a profit on each share of $32.80. The association did not earn the said profit, but sustained losses and incurred expenses during that period, by reason of which the investment earned very much less than the estimated profit. Article 22 of the by-laws provided that, "should any shareholder under ninety-six months' contract desire to withdraw from the association, he may do so by giving thirty days' notice in writing to the secretary, and he shall receive the amount paid by him with legal interest thereon, less entrance fees and other charges due the association." The association did not earn a profit equal to the legal interest on the amount paid in by the petitioner. On August 2, 1895, the association amended its articles of organization, and became a mutual loan and building association, under the laws of this state, and afterwards acquired a large number of members who paid on their stock, and who were chargeable with their proportionate share of losses and expenses, and were entitled to share in any profits earned, and whose contracts were in force when the receiver was appointed. Since petitioner became a member, a large number of other persons became members under similar contracts, but who did not obtain loans, and whose shares of stock have not been prepaid. Since petitioner became a member, the association acquired a large number of members under the 100-months plan, who were in good standing at the time the receiver was appointed, on March 11, 1897. The association was insolvent at that time, and for a long time prior thereto. As conclusions of law, the court found that the contract between petitioner and the association was valid and binding; that, upon the appointment of the receiver, the association became unable to carry out its contracts, and thereupon the bond and mortgage mentioned "became due and payable *in solido*." Thereupon the court made an order

directing the receiver to charge the petitioner with the amount of $2,000 and legal interest from the date of the loan to the date of the appointment of the receiver, and credit her with the amount of each payment made by her during that period, with legal interest from the time when made to the date of the appointment of the receiver; and, upon payment of any balance, the receiver was to release the said bond and mortgage. From this order the receiver takes this appeal.

*Sarah A. Eggleston's petition:* Upon the issue made by the petition of *Sarah A. Eggleston,* the court made findings that the association made a contract with her, as follows: " This is to certify that *Sarah A. Eggleston* . . . is the owner of nineteen shares of stock, of the maturity value of one hundred dollars each, in the National Building and Loan Association . . . and that said *Sarah A. Eggleston* has paid . . . the sum of $1,105.80, being ninety-six instalments of seventy cents each upon each share of said stock, less a rebate of $9 upon each share for the full time. And, in consideration of the aforesaid payment, the association hereby agrees to pay the said *Sarah A. Eggleston* . . . the sum of $100 for each of said shares at the end of eight years from the date hereof. This certificate is issued to and accepted by the holder upon the following express terms and conditions: (1) The said shareholder shall not have any claim or interest in the affairs, assets, or funds of the association except as above set forth, and assumes no liability of any kind except as hereuntofore described. (2) It is understood and agreed that these shares may be surrendered at any time after two years from date of issue, upon ninety days' notice, and the owner shall receive the sum actually paid with six per cent. simple interest from date until payment. (3) This certificate may be assigned by indorsement in writing upon the back hereof, but no assignment shall be valid as against the association unless the same shall have been

approved by the secretary." That said contract was entered
into in pursuance of a by-law of the association (article 29),
which says that "the board of directors may offer for sale
prepaid stock or stocks upon which instalments may be fully
paid in advance, at such rates of discount as may be deter-
mined, and may issue certificates of deposit to its members,
or interest-bearing stock, in such sums and under such rules
and regulations as shall be for the best interests of the asso-
ciation." That petitioner is the owner of said certificate.
That the association never had any fund or capital except-
ing the instalments received from its members in payment
on their shares of stock, and its only means of earning profits
was in loaning the same on interest. That, during the time
the petitioner held said certificate, the association incurred
expense and sustained losses, so that it never earned the
profit it agreed to pay on said contract. That, at the time
of the appointment of the receiver, there was a large num-
ber of members who had paid large sums of money to the
association, and who had borrowed large sums on bond and
mortgage. As conclusions of law, the court found that the
petitioner never became a member of said association under
said contract, and is not chargeable with any of its losses or
expenses, and that said contract is not a valid certificate of
stock; that the contract is a valid obligation to pay petitioner
the sum of money therein mentioned, being the amount paid
by petitioner, with interest at six per cent.; that, under and
by virtue of said contract, petitioner is a creditor to the
amount she has paid, with interest, and is entitled to be paid
said sum in preference to the claims of stockholders, and in
common with other creditors. From the order entered in
pursuance of these conclusions, the receiver appealed.

*F. H. White's and Sarah Van Pelt's petition:* Upon this
petition the finding of the court shows that on July 24, 1889,
one George C. White, Jr., made a written application for
ten shares of ninety-six months stock, and which was issued

to him on August 1, 1889; that on May 26, 1892, said White applied for a loan of $1,000; that July 1, 1892, his application for a loan was accepted, and White made and delivered his bond and mortgage on certain real estate, and the association paid him $1,000; that White paid all instalments due thereon up to the appointment of the receiver; that the stock issued to White was definite contract stock, to mature at the end of ninety-six months, and would include a profit of $32.80 per share. Then follow findings as to the change in the articles of organization; that White's stock had not matured when the receiver was appointed; that expenses were incurred, and losses sustained, and the profits were not earned as contemplated; that, after the amendment of its articles, other members came in, who are entitled to share in profits and are chargeable with losses and expenses; that White died in March, 1893, and the real estate described in the mortgage and said ten shares of stock were duly assigned to *Sarah M. White*, as the only heir at law; and that on September 10, 1894, petitioners became the owners of the mortgaged premises, subject to said mortgage; and that they continued to make the monthly payments due on the bond and mortgage until the receiver was appointed; and that White and petitioners had paid ninety instalments on the stock and fifty-five instalments of interest on the mortgage. As conclusions of law, the court found that the contract of membership was a valid and legal contract; that petitioners had fully complied with the terms of the contract of membership, and of the bond and mortgage, up to the time of the appointment of the receiver; that there remain six monthly payments, of $15.34 each, unpaid, which the petitioners tender, and the payment of which entitles the petitioners to a satisfaction and release of the mortgage. From an order entered in accordance with the findings, the receiver appeals.

For the appellant there were briefs by *David S. Rose* and *Hugh Ryan*, and oral argument by *Mr. Ryan*.

For the respondent *Langworthy* there were separate briefs
by *Chas. G. Woolcock* and *Winkler, Flanders, Smith, Bottum
& Vilas;* for the respondent *Eggleston* there was a brief by
*Edwin F. Van Vechten;* for the respondents *White* and *Van
Pelt* there was a brief by *Elliott & Hickox;* and the cause
was argued orally by *Mr. Van Vechten, Mr. Woolcock, Mr.
S. W. Dalberg, Mr. S. T. Hickox,* and *Mr. F. H. Remington.*

For the respondent *Langworthy,* counsel contended, *inter
alia,* that when a member of a building and loan association
becomes a borrower the transaction is considered so much
in the nature of a loan that subsequent payments made by
him upon his stock are partial payments upon the debt.
*Overby v. Fayetteville B. & L. Asso.* 81 N. C. 56; *Hoskins v.
Mechanics' B. & L. Asso.* 84 id. 838; Endlich, Building Asso.
(2d ed.), § 523. Each payment is therefore a *pro tanto* ex-
tinguishment of the debt. *Kupfert v. Guttenberg B. Asso.*
30 Pa. St. 465; *Hughes' Appeal,* id. 471; *Philanthropic
Building Asso. v. McKnight,* 35 id. 470; *Randall v. Nat. B.,
L. & P. Union,* 42 Neb. 809, 29 L. R. A. 133; *Brownlie v.
Russell,* L. R. 8 App. Cas. 253. Respondent's assignment of
her shares to the association was not an hypothecation for a
loan, but an absolute sale and surrender of them to the asso-
ciation, whereby they are sunk and extinguished, and can-
not entitle the borrower to participate in the final division
and distribution of the funds of the association; she no
longer had any interest in the society. *Delano v. Wild,* 83
Am. Dec. 605, 6 Allen, 1; *Mich. B. & S. Asso. v. McDevitt,*
77 Mich. 1; *Parker v. Fulton L. & B. Asso.* 46 Ga. 166;
*Pabst v. Economical B. Asso.* 1 MacArthur, 385; *White v.
Mechanics' B. F. Asso.* 22 Gratt. 233; *Cason v. Seldner,* 77 Va.
293; *Bowker v. Mill River L. F. Asso.* 7 Allen, 100; Thomp-
son, Building Asso. (1st ed.), 85; Endlich, Building Asso.
§ 122; 4 Am. & Eng. Ency. of Law (2d ed.), 1062. The con-
tract existing between the respondent and the association is
*ultra vires* and void. *Wierman v. International B., L. & I.*

*Union*, 67 Ill. App. 550; *International B., L. & I. Union v. King*, 68 id. 640. The corporation is accountable for the benefits it has received under that contract, with interest, and respondent is entitled to be credited with what she has paid, with interest. 2 Beach, Priv. Corp. 700; *New Castle N. R. Co. v. Simpson*, 23 Fed. Rep. 214.

Counsel for the respondent *Eggleston* contended, *inter alia*, that, in case she should be held to be a member of the association, her stock is preferred stock, and should entitle her to payment in full in preference to the common stockholders. *Munhall v. Boedecker*, 44 Ill. App. 131; *In re Guardian P. B. B. Soc. (Scott's Case)*, 23 Ch. Div. 453, 464, 465. Such stock does not bear any part of the losses of the association. *In re Reliance P. B. B. Soc.* 61 L. J. Ch. (N. S.), 453.

BARDEEN, J. It would be practically impossible, within reasonable limits, to trace out the chrysalis character of the defendant corporation. It was first organized in 1887, its ostensible purpose being the accumulation of funds by monthly contributions of its members, making loans to its members and stockholders, and making such other investments as it might deem proper, the buying, selling, and holding of real estate, and the holding and selling of real estate or other property taken on foreclosure. Its capital stock was $5,000,000, divided into ten series of $500,000 each, the par value of each share being $100; and the shares were made payable in monthly instalments of seventy cents on each share. From time to time during its existence its articles of organization were changed, until at the time of its decease it was presumably a genuine building and loan association. During the period of its existence it adopted by-laws and issued stock on the different schemes and plans as set out in the statement of facts, and upon other plans not material to this decision. During all its mutations its paramount theory

was akin to that of the ordinary building and loan association, although it did not conform to the law of this state in manner of dealing with its members or in the character of the stock issued. It finally crystallized itself into a regular building and loan association under the provisions of the law of this state, and it is upon that status we must define and determine the rights and relations of its members and stockholders. What we say in this opinion must be deemed to apply to all the petitioners alike, unless a contrary purpose is evident from the language used.

The fundamental idea of a building and loan association is mutual profit sharing. Its business necessarily is confined to its own members. Its object is to raise a fund to be loaned to its members. Each shareholder, whether a borrower or nonborrower, participates alike in all profits earned, and alike must assist in bearing the burden of expenses and losses. Such associations are the only ones that can issue their capital stock before it is paid for. The member makes his application, receives his stock, and agrees to pay for it in monthly instalments at a fixed rate. In case of default, he is subject to fine, which goes into the general profit fund for all alike. When the aggregate dues he has paid, with the credited earnings, equal the face value of his stock, he can no longer share in the earnings, and his stock is retired, and his membership in the corporation ceases. But the member has no claim to, or property in, any specific fund of the association. *Atwood v. Dumas*, 149 Mass. 167. The theory of our statutes and the law of *all* the cases is to the effect that such associations are purely mutual in their character, and that the members share in the common gains, and, from the very necessity of their relations, must bear a proportionate share of the losses. Probably, under our law, such an association would have no right to issue what is called "definite contract stock." Such stock is opposed to the fundamental principle of such associations. The members themselves constitute

the corporation.   It has no capital except such as it receives from its members in monthly instalments and its interest earnings.   When the corporation aggregate agrees with all its members to pay them a definite amount at a given time, regardless of whether the anticipated profit has been earned or not, unless the requisite profit has been earned it is quite evident that some one must suffer.   The principle of equality and mutuality would thereby be destroyed.

But in the present case it is unnecessary to determine whether such stock would be *ultra vires* or not.  The parties before the court all stand on the same footing in this respect. They were all bound to take notice of the limitations on the powers of the association; and when they became members and assented to the contract in that form they became foreclosed from contesting it.   They must all stand or fall together, and our chief concern is to see that justice and equity is done between them.   It is insisted, however, that this association was not *organized* as a mutual company, and therefore the right of the members must be determined according to the strict letter of their contracts.   The impossibility of performance of these contracts has been determined by the judgment of insolvency.   It is admitted on all sides that the company cannot carry out its plans as originally intended. But who constitute the corporation, if not its members? Each member has a contract with every other member.  The nonborrowers hold on agreement that, if they make certain payments for a given length of time, the corporation will pay them a definite sum at the expiration of that period. The borrowers have the same contract to begin with, but which has been modified to the extent that the corporation has advanced to them an amount equivalent to the face value of their stock, upon which the borrower agrees to pay, in addition to the monthly payments on his stock, certain fixed interest charges.   Both agreements were made in contemplation of a profit of $32.80 per share.   Under the plan of

organization this profit was to come from interest earnings, fines, etc., and from no other source. This fact, taken in connection with the charter and by-laws, leads to no other conclusion than that this was a mutual profit sharing institution.

We must now determine the status of these several members, and their relations to each other; the corporation being insolvent. In other words, what effect has the insolvency of the association upon the membership contract and upon the loan contract? The authorities are not entirely in accord upon that subject. Substantially all agree that the insolvency of the association has the effect at once to stop all liability for stock payments. Endlich, Building Asso. (2d ed.), § 523; *Strohen v. Franklin S. F. & L. Asso.* 115 Pa. St. 273. And this applies equally whether such members be merely investors or also borrowers. "The liability to pay monthly dues or fines, or interest on the amount advanced, cannot extend beyond the existence of the association." *Cook v. Kent,* 105 Mass. 246. The dissolution of the association necessarily puts an end, not only to its capacity to receive, from time to time, the small payments due from its members, but also to the possibility of their being turned to account, for their benefit, by means of the system of investment and reinvestment peculiar to the building association. The member's duty to make regular stock payments — a duty incident to his membership only — ceases, for the stock itself is destroyed, and the membership dies with the corporation. Not only is this so, but the further fact is established, almost without dissent, that upon the premature dissolution of such an association the advanced members may be compelled to pay forthwith the balances due from them on their securities, although the latter be given in terms only for the payment of instalments. Endlich, Building Asso. § 523; *Weir v. Granite State P. Asso.* (N. J. Ch.), 38 Atl. Rep. 643; *Curtis v. Granite State P. Asso.* 69 Conn. 6; *Waverly*

*M. & P. L., L. & B. Asso. v. Buck,* 64 Md. 338; *Low St. B. Asso. v. Zucker,* 48 Md. 448; *Buist v. Bryan,* 44 S. C. 121.

Thus it seems that, as the corporation is defunct, membership ceases, and all contracts must, therefore, of necessity be set aside.    It is upon the theory of the rescission and abrogation of the contracts that equity steps in, and winds up its affairs, and makes a ratable distribution of assets.

In this connection it may be well to refer to a clause on each certificate of membership issued prior to 1895.    After certifying that the member is the holder of so many shares of stock of a certain maturity value, and in consideration of the first payment, together with the agreements contained in the application for membership, etc., the association will pay the member the maturity value of the stock upon the expiration of the period therein limited, the stock certificate further says: " This certificate is issued to and accepted by the holder upon the following express terms and conditions: 1st.  The said shareholder shall not have any claim or interest in the affairs, assets, or funds of this association, nor the control of them, except as above specifically set forth, and assumes no liability of any kind whatsoever except as hereinbefore described."    It is urged that under this contract the shareholder had no liability except the payment of his monthly instalments, and it follows as a necessary corollary that he is not liable for any losses or expenses.    It is doubtful if this would be the legal effect of the contract when we come to consult the by-laws, which are printed on the back of all stock except prepaid certificates.    But, whether it would or not, the insolvency of the association is alike fatal to this as well as to the other terms of the contract.    If this were not so, it would lead to endless confusion and complication.    If this claim is good for one, it is good for all.    If these borrowers are exempted from liability for losses, then every nonborrower may claim the same privilege, and each stockholder would, in legal effect, become a preferred cred-

itor in the order in which he took membership,— a proposition utterly at variance with the scheme of the organization, and in violation of the plainest principles of equity.

This leads us to a consideration of the status of the borrowing members with reference to the corporation, and their liability to sustain their ratable share of the losses of the association. Does the borrowing member still remain a member of the corporation? Under the charter and by-laws there can be no reasonable doubt but that he does. He is not in the position of an ordinary borrower of money. He remains a member of the association, subject to its charter and by-laws, and in taking the advance on his shares he is only allowed to anticipate the final redemption of all shares. His assignment of his stock as collateral to his loan does not cancel his membership. By the very terms of his loan he agrees to pay the dues on his stock until maturity. He participates in the earnings which are to go towards discharging the obligations on his loan, and to shorten the time when he will be fully discharged therefrom. *Eversmann v. Schmitt,* 53 Ohio St. 174; Endlich, Building Asso. §§ 122–124; *Mechanics B. & L. Asso. v. Conover,* 14 N. J. Eq. 219; *Parker v. Fulton L. & B. Asso.* 46 Ga. 166. Hence, being equally entitled with all the others, in the direct ratio of his interest in the society, to share in the common gains of the enterprise, he is liable to contribute, in the same proportion in which he expects to profit, to the losses and expenses incident to the management. Endlich, Building Asso. §§ 77–79, 518; *McGrath v. Hamilton S. & L. Asso.* 44 Pa. St. 383.

The association being insolvent, nothing remains to be done but to wind up its affairs so as to do equity between the creditors and between the members themselves. As regards the latter, care should be taken to adjust the burdens equally, and not to throw upon either borrowers or nonborrowers more than their respective shares. Just how to reach this result has given rise to a great contrariety of decisions.

The learned judge of the superior court held, as to the *Langworthy* petition, that the mortgagor should be charged with the amount of her mortgage, with legal interest, and credited her with *all* payments made to the association, with legal interest. This ruling, in effect, gave her, not only the benefit of all interest payments, but also all payments made on her stock, in reducing the amount of her mortgage debt. This could only be justified on the theory that when she obtained a loan she ceased to be a member of the association. As we have already seen, he was not justified in such a conclusion. Her rights should have been ascertained and defined on the basis that she remained a member, notwithstanding her loan. To allow *Mrs. Langworthy* to credit upon her mortgage her payments on her stock, would enable her to escape responsibility for her share of losses, and throw them wholly upon the nonborrowers; in other words, the borrowers would escape without loss. So palpable an injustice cannot be sanctioned. While the mortgage may secure the payment of both stock dues and interest, they stand upon an entirely different footing. Interest is not paid as a stockholder, but as a borrower. Stock dues are paid by all members, and the funds accumulated by their payments belong to all the members alike. If by maladministration of the affairs of the association the fund is diminished, the losses should fall evenly upon all. As we view it, the equitable rule would be to charge the petitioner with the amount of her loan at legal interest, and credit her with all *interest* payments made by her, on the principle of partial payments, as stated in *Hill v. Durand*, 58 Wis. 160, and upon payment of the balance found due, then to release her mortgage. This is the rule adopted in Pennsylvania, the mother of building and loan associations in this country, and finds ready support in other jurisdictions. *Strohen v. Franklin S. & L. Asso.* 115 Pa. St. 273; *Rogers v. Hargo,* 92 Tenn. 35; *Weir v. Granite State P. Asso.* (N. J. Ch.), 38 Atl.

Rep. 643. Whatever may be due her upon her stock can be readily ascertained when the affairs of the corporation are wound up and final distribution made.

The same rule must be applied to the order made on the *White* and *Van Pelt* petition. White became a member in his lifetime, and afterwards secured a loan. His status as a member became fixed at that time. The contract became no more sacred or inviolable because of his death. Neither did the fact that these petitioners afterwards became the owners of the mortgaged premises change the situation. They can secure no greater rights than White would have had had he lived. In equity they might possibly be subrogated to the right to claim whatever may be found due on stock, but that is not now available in reduction of the mortgage debt.

As to the *Eggleston* petition, a somewhat different question has arisen. The court below found that she never became a member of the association, but was a creditor thereof, and entitled to be paid the amount she had paid in with interest, in common with other creditors, and in preference to the claims of stockholders; in other words, that her transaction with the association was, in legal effect, but a loan of so much money. We need not concern ourselves over the question of whether, under its articles, the corporation had authority to issue this class of stock or not. The stock was issued and accepted by the petitioner, and we cannot permit either the receiver or the holder to question its validity. It is certainly valid as between the parties, so long as it does not contravene public policy and was not issued in defiance of any statutory prohibition. We are not advised of the precise ground upon which the court based its decision. Probably it was upon that clause in the certificate before quoted, to the effect that the holder should have no claim or interest in the affairs of the association, etc. The certificate under which the petitioner makes claim recites that she

is "the owner of nineteen shares of stock" in the association, of the par value of $100; that she has paid therefor $1,105.80, being ninety-six payments of seventy cents each, less a rebate of $9 on each share. In consideration thereof the association agrees to pay her $100 for each share at the end of ninety-six months. This includes a profit of $32.80 on each share, besides the rebate, and is the same profit that was to be paid to other stockholders. Article 29 of the by-laws provided that the board of directors might offer for sale "prepaid stock, or stock upon which instalments may be fully paid in advance." There can be no doubt but that *Mrs. Eggleston* made her investment under this by-law, and it is equally clear that she thereby became a member of the association. The fact that her relations with the company were somewhat limited did not prevent her becoming a member. Such construction must be given the certificate as will effectuate the intention of the parties. The first part of the certificate deals with both parties on the basis of petitioner's membership in the association. To construe the limiting clause mentioned to devest her of membership in the association, is to render the other part of the certificate entirely nugatory. This would be contrary to the evident intention of the parties, and contrary to the rules of construction laid down in *Wis. M. & F. Ins. Co. Bank v. Wilkin*, 95 Wis. 111.

On the basis that the petitioner became and is a member of the association, the contract between them became impossible of performance, because of the insolvency of the company. Upon that basis her counsel argues that her stock became preferred, and entitled her to payment in full, in preference to holders of other kinds of stock. Just why this is so is not at all evident. There is nothing in the stock contract or in the charter or by-laws that would give it this distinctive character. All classes of stock are equally meritorious, and in marshaling the assets no stockholder, in the

absence of some provisions in the charter or by-laws of the association, should be given preference over another. *Hohenshell v. Home S. & L. Asso.* 140 Mo. 566.

The case of *Gibson v. Safety H. & L. Asso.* 170 Ill. 44, seems to me to be especially applicable to the matter under consideration. The court says: "Each of these certificates was issued upon the payment to this association of fifty dollars. The holders now say that the association had no authority under the law to issue them. In other words, they contend that a building and loan association, under the statutes of this state, cannot lawfully issue paid-up stock; and from that premise they conclude that they themselves may repudiate the validity of the stock, and, to the extent of the money paid therefor, they should be treated as preferred creditors of the association. If it be true that the association had no authority of law to issue the stock, it is equally true that the holders of the stock had no right or authority of law to accept it; and, if they were claiming any benefit therefrom, other stockholders might, with propriety, question the legality of the transaction. But the holders of the stock are in the anomalous position of themselves repudiating its validity, and thereby seek to obtain an advantage over those who are the legal stockholders of the association. It seems to us unreasonable to say that these stockholders may be allowed to assert the illegality of the action of the building association, to which they themselves were parties, and at the same time, by reason of that illegality, place themselves in a better position than they would have been had their stock been valid. They bought paid-up stock. They paid for it. No one is questioning their right to the benefit of that stock, and, clearly, they cannot be heard to do so." This leaves very little more that needs to be said. The failure of the association is a calamity both to the prepaid and deferred payment stockholders. In their tribulation, when they appealed to the court of conscience, they must be con-

tent to be put on as nearly an equal footing with other stock-holders as human judgment can place them. This will be done by allowing the petitioner's claim as a stockholder, and giving her a just share of the assets, after all losses and expenses have been adjusted and paid.

*By the Court.*— As to the appeal from each of the three orders mentioned, the orders of the superior court of Milwaukee county are reversed, and the cause is remanded for further proceedings according to this opinion.

