THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* METROPOLITAN MUTUAL SAVINGS AND LOAN ASSOCIATION, Defendant.

In the Matter of the Claim of DELILAH GOOD and Others, as Holders of Stock in Class "H," in the Above Defendant Corporation, Appellants, Respondents, to Be Preferred to the Holders of Common Installment Stock Therein upon Distribution by the Receiver.

JAMES A. ROBERTS, as Receiver of the METROPOLITAN MUTUAL SAVINGS AND LOAN ASSOCIATION, Respondent, Appellant.

*Insolvent building and loan association — distribution of its assets in case of insolvency — payment of the referee's fees on a reference to ascertain preference — value of stock withdrawn, estimated as of what date.*

The general principles relating to the distribution of the assets of insolvent building and loan associations are as follows : After the ordinary costs of winding up the association are paid, interested parties occupying the position of general creditors are entitled to be paid in preference to those whose claims are founded upon the relation which they sustain to the association as members thereof, unless the irregular acts of the creditor caused the insolvency; but the courts are inclined to treat the rights of all those holding the relation of stockholders as equal and to allow no priorities in their claims. This is true, notwithstanding that the stockholder has given notice of withdrawal, although such notice has matured and he has received orders from the treasurer for the payment of the withdrawal value of his stock, but where the rules and by-laws of the association are held to govern the distribution in insolvency, the same as when the association was a going concern, the rule may be otherwise.

In order to warrant a finding that any particular class of stock issued by such an association should have preference in the distribution of its assets in the case of insolvency, the articles of association should so state in a plain and positive manner, free from ambiguity and doubt.

In the case at bar, it was further held that the Special Term, in directing the receiver of an insolvent savings and loan association to pay the disbursements of a reference, ordered to determine questions of preference raised by the holders of different classes of stock issued by the association, did not so abuse the discretion vested in it as to require interference by the Appellate Division.

If the articles of association do not provide how the funds shall be distributed in case of insolvency, equity requires that the withdrawal value of the stock at the time the action for the dissolution of the association was commenced shall be the basis upon which the assets of the association shall be proportionately distributed.

APPEAL by the claimants, Delilah Good and others, from an order of the Supreme Court, made at the Erie Special Term and entered in the office of the clerk of the county of Albany on the 18th day of August, 1904, confirming the report of a referee appointed to determine the question raised by the claimants to a preference in the distribution of the assets in the hands of the receiver of the defendant company, except so much of said order as denies the receiver's motion that costs and disbursements be made a charge against the claimants and directs that the said receiver pay the disbursements of the reference.

Also an appeal by James A. Roberts, as receiver of the Metropolitan Mutual Savings and Loan Association, from so much of said order as directs him from the funds in his hands to pay said disbursements of the reference.

The Metropolitan Mutual Savings and Loan Association was organized in 1885 under chapter 122 of the Laws of 1851, and the acts amendatory thereof and supplemental thereto. It did business until August 16, 1897, when all its liabilities were discharged and its assets distributed. It was then reorganized and new articles of association and by-laws were adopted and it commenced business again at once and continued business until May 1, 1902. This action was then commenced, and on July 15, 1903, judgment was entered dissolving the corporation by reason of its insolvency. A temporary receiver was appointed when this action was commenced and he was subsequently continued as the permanent receiver.

By the articles of association adopted August 16, 1897, the purpose of the association was stated as follows: "This Association was and is incorporated for the purpose of accumulating a fund for the purchase of real estate, the erection of buildings, the making of other improvements upon lands to pay off incumbrances thereon, to aid its members in acquiring real estate, making improvements thereon, and removing incumbrances therefrom; and for the further purpose of accumulating a fund to be returned to its members, who do not obtain advances as above mentioned, where the funds of the Association shall amount to a certain sum per share as hereinafter specified, and for the transaction of the general business of a Building, Mutual Loan and Accumulating Fund Association." (Art. 1, § 2.)

The purpose thus stated is substantially the same as provided by section 1 of chapter 122 of the Laws of 1851.

The articles of association also provide: "A member is the holder of a share in any class of stock and for each share so held he has one vote, in person or by proxy, at all meetings of the stockholders; but in funds, profits, or otherwise he has no interest beyond the par value of his shares." (Art. 1, § 4.)

Said articles further provide: "The capital stock is presently divided into shares of one hundred dollars each and into four general classes known as Guarantee Fund Stock, Common Installment Stock, Prepaid and Fully Paid Stock, and Common Installment Stock into four classes known as A, B, C, and D, respectively." (Art. 2, § 4.)

On January 18, 1899, said section of said article was amended so as to read as follows: "The capital stock is presently divided into shares of one hundred dollars each and into six general classes known as Guaranteed Fund Stock, Common Installment Stock, Common Installment Loan Stock, Prepaid and Fully Paid Stock and Real Estate Investment Stock and Common Installment Stock into four classes known as A, B, C, and D, respectively, and the Common Installment Loan Stock into three classes known as L, M, and N, respectively."

Said articles further provide: "On each share of Common Installment Stock, until maturity, by the third business day of each month twenty-five cents must be paid on Class 'A,' fifty cents on Class

' B,' seventy-five cents on Class ' C,' and on Class ' D ' one dollar."
(Art. 2, § 5.)

Said articles further provide : " The par value ($100.00) of all
classes of Fully Paid Stock and the present value of Prepaid Stock
must be paid at subscription and the Association will issue its
paid-up certificate therefor, bearing interest not exceeding six per
centum per annum, or providing for a participation in profits pay-
able out of general net earnings."   (Art. 2, § 6.)

On January 16, 1901, said section was amended by adding after
the word " annum " the words " except class K."

Said articles further provide : " Payments upon Installment Stock
may be made in advance and when so made for six months or more
a discount will be allowed for the average time at such rate not
exceeding six per cent as the Board of Directors may determine."
(Art. 2, § 7.)

Said articles further provide : " In addition to the issue of Com-
mon Installment Stock in Classes A, B, C, and D, the Association
may presently issue in shares of One Hundred Dollars each, the fol-
lowing kinds and classes of stock :  *   *   *

" Class E.   A class to be known as Guaranteed Six Per Cent
Income, the par value of which shall be paid at subscription, and in
and by the terms and conditions thereof provide that the same can-
not be withdrawn until after three years from the date of issue, and
then only on thirty days' notice and agree within the provisions of
its articles to pay a semi-annual dividend thereon, on the first day
of each July and January at a rate not to exceed six per centum
per annum.   *   *   *

" Class II.   A class to be known as Prepaid Accumulative of the
present value of fifty dollars per share, to be paid at subscription,
and in and by the terms and conditions thereof agree within the
provisions of its articles to pay a semi-annual dividend thereon, on
the first day of each July and January, at a rate not to exceed six
per centum per annum upon the amount then to the credit thereof,
and provide that the shares cannot be withdrawn until after two
years from the date of issue, and then only upon thirty days' notice
when the member shall be paid the withdrawal value thereof as last
established.   *   *   *"   (Art. 2, § 8.)

Said section of said article was also amended on the 18th day of

January, 1899, by adding in the 1st paragraph thereof after the words " classes A, B, C, and D," the words " and Common Install-ment Loan Stock in Classes L, M, and N," and also by adding class K, as follows : " A class to be known as Class ' K ' Seven Per Cent Income, the par value of which shall be paid at subscription and in and by the terms and conditions thereof, provide that the same can-not be withdrawn until after one year from the date of issue, upon sixty days' notice, the Association reserving the right to call in any and all of this stock at any time after two years from the date of issue and agree within the provisions of its articles to pay a semi-annual dividend thereon, on the first day of January and July at a rate not to exceed seven per centum per annum."

That part of said section relating to class H was amended by adding thereto the following : " In addition to such cash dividends this stock will be credited with such profits as may appear to be its equitable share of the net surplus earnings of the Association to mature it to its par value."

Said articles further provide : " The books will be closed on the twentieth day of each December and June, and, within the next ten days, the net unapportioned profits will be ascertained and appor-tioned according to the conditions governing the several shares and classes of stock then outstanding, and the withdrawal and holding value of the installment shares and the prepaid stock established." (Art. 4, § 1.)

" No profits, dividends, or interest on shares will be paid beyond the apportioned profits applicable thereto."    (Art. 4, § 2.)

" Before apportioning profits, the Board of Directors may set apart therefrom to a Reserve Fund a sum not greater than ten per cent of the then unapportioned profits, to indemnify losses."    (Art. 4, § 3.)

Said articles also provide : "After fully indemnifying the Reserve Fund as the Board of Directors may have resolved and the payment of losses and all general and operating expenses, the balance then remaining is the Loan Fund ; but all such expenses as far as may be, will be paid out of the authorized attorney, appraisal, membership, withdrawal and transfer fees and such expense fund deductions from payments on shares as may be authorized by these articles." (Art. 5, § 1.)

Provision was also made in the articles of association for perma-
nent expense fund deductions on each share of the several classes of
stock, including class H, " One dollar and fifty cents the first year
and fifty cents per year thereafter." And on classes E, F and G
" Three dollars per share the first year and one dollar per share each
year thereafter to be charged against general profits and credited
Expense Fund Account; and in consideration of the fact that these
classes of stock do not participate in general profits beyond an
ultimate fixed dividend, although said deductions may be used for
expenses, the stock shall be carried as a liability at its par value."

By the amendments to the by-laws January 18, 1899, the provi-
sion for permanent expense fund, so far as it related to class H, was
changed to read : " One and fifty one-hundredths per cent of the
par value the first year, and one-half of one per cent per annum
thereafter of the par value to be paid out of earned profits thereon,"
and the provision in regard to classes E, F and G was changed so as
to read : " Three per cent of the par value the first year and one
per cent per annum of the par value thereafter ; and on Class ' K ' two
per cent of the par value the first year and one per cent per annum
of the par value thereafter, charged against profits to said stock
apportioned in classes E, F, G and K, and credited to Expense
Fund Account, and in consideration of the fact that these classes of
stock do not participate in general profits beyond the ultimate fixed
dividends, although said deductions may be used for expenses, the
stock shall be carried as a liability at its par value."

Said articles also provide : " The shares of Common Installment
Stock, issued in any calendar month, will be matured as a series, and
at maturity the holder will be paid the par value thereof, but
unpledged shares of such stock are withdrawable at any time before
maturity after two years from the date of issue, when, upon surren-
der of his certificate, the holder will be paid the full amount of dues
to the credit of the shares withdrawn, less his membership and with-
drawal fees, if any, authorized expense fund deductions, and any
other sums lawfully chargeable thereto, with interest or profits pay-
able out of the then apportioned profits, depending for amount upon
the age of the certificate therefor, as provided in the next section."
(Art. 6, § 1.)

" All withdrawals will be paid in the order of filing a notice of

such intention, and the Association cannot be required to pay withdrawing members in any month more than one-half the receipts of the Loan Fund that month." (Art. 6, § 4.)

" Interest at a rate not to exceed six per cent per annum will be allowed upon advance payments on Common Installment Stock for the average time." (Art. 9, § 5.)

" By the fact of application for membership a member consents that these Articles, and all lawful amendments thereto and By-Laws adopted in accord therewith, form a part and parcel of all contracts between him and the Association and between him and all other members." (Art. 11, § 3.)

The other sections of said articles and the other amendments do not materially affect the questions under consideration.

All persons subscribing for any of the classes of stock of the association were required to sign a written application for membership, specifying the number of shares and class of stock desired, and in which written application the applicant agreed to comply with and abide by all the terms, conditions, directions and agreements contained in the articles of incorporation, by-laws, rules and regulations of the association and made the same a part of the contract with the association.

The certificates issued for the several classes of stock are the same in general form and in the terms, conditions and indorsements thereon except in slight change of language. In case of common installment stock, the certificates certify that the person to whom the certificate is given " has subscribed for and is the owner of shares of class , COMMON INSTALLMENT stock therein of the par or maturity value of One hundred dollars each."

In case of class E stock there is a statement on the face of the certificate in words and figures as follows : " Fully paid $ ." And the certificates certify that the person to whom the certificate is given " has subscribed for and is the owner of shares of GUARANTEED SIX PER CENT INCOME stock therein of the par or maturity value of One hundred dollars each."

In case of class K stock there is a statement on the face of the certificate in words and figures as follows : " Fully paid $ ." And the certificates certify that the person to whom the certificate is given " has subscribed for and is the owner of shares of

GUARANTEED SEVEN PER CENT INCOME stock therein of the par or maturity value of One hundred dollars each."

And in case of class H stock there is a statement on the face of the certificate in words and figures as follows : "Fifty dollars per share paid at date of issue" and the certificates certify that the person to whom the certificate is given "has subscribed for and is the owner of        shares of PREPAID ACCUMULATIVE stock therein of the par or maturity value of One hundred dollars each."

When the association went into the hands of a receiver there were outstanding of the different classes of stock the number of shares of the par and paid in value as follows :

| | | | |
|---|---|---|---|
| Class E. | 286.48 | $28,648 | $28,648 00 |
| Class F. | 1. | 100 | 100 00 |
| Class K. | 64.50 | 6,450 | 6,450 00 |
| Class H (½ prepaid) | 123. | 12,300 | 6,150 00 |
| Class H (½ prepaid but not issued) | | | 41 00 |
| Class J | 45. | 4,500 | 862 62 |
| Classes A, B, C, D, I, L, M, N. | 84,523. | 8,452,300 | 192,873 65 |
| | 85,042.98 | $8,504,298 | $235,125 27 |

Claimants are the owners of 230.50 shares of class E stock, 8 shares of class K stock and 43 shares of class H stock, having paid in thereon $26,000 and they have severally presented to the receiver a claim on their shares of stock insisting that they are entitled to preference in the payment of their claims and that their claims should be paid by the receiver in full before any payment is made on account of claims presented against the receiver on other classes of stock. The receiver denied the claim for preference, and the court appointed a referee to hear, try and determine all questions raised by the presentation of said claims and the rejection thereof. The referee denied the appellants' claim for preference and the report of the referee was confirmed by the court. The court also directed that the disbursements of the reference be paid by the receiver. The claimants have appealed from such order, except so far as the same directs the payment of the disbursements of the reference, and the receiver has appealed from that part of the order directing him to pay said disbursements.

*Frederick Greiner*, for the claimant Knox.

*Wilson & Smith*, for the claimant Wilson.

*Martin Clark,* for the claimant Cook.

*Lockwood & Lockwood,* for the claimant Wasson.

*Bertrand W. Nye,* for other claimants.

*Irving W. Cole,* counsel for all claimants, appellants, respondents.

*Clark H. Timerman,* for the receiver, respondent, appellant.

CHASE, J. :

A careful consideration of the articles of association leads us to the conclusion that the possible insolvency of the association was not in the contemplation of the incorporators or of the members of the association in changing the articles of association from time to time. The articles of association seem to have been prepared with entire confidence that the somewhat intricate system of stock certificates and the numerous classes of stock would be attractive to many investors, and that money would be received and continued with the association and so invested that the profits therefrom would not only be sufficient to pay an expense account out of all proportion to the business transacted, but also sufficient to leave a large net balance for distribution. All classes of stockholders were given the right to withdraw from the association at the times and on the terms expressly stated in the articles of association.

By the express terms of the articles of association withdrawals by stockholders (all classes) were to be paid in the order of filing notice of intention to withdraw, but the association could not be required to pay withdrawing members in any month more than one-half of the receipts of the loan fund for that month. So long as the association remained solvent no question could ever be raised in regard to a preference in the payment of the full or withdrawal value of the different classes of stock, either while the association continued in business as an association, or in case of its dissolution. There is not a word in the articles of association in any way expressly referring to the question of the distribution of the assets of the association in case of insolvency, and nothing that in our judgment can be construed as having any reference to such possible insolvency. Every person having a share of stock in the association became a

member of the association and entitled to vote on such share in person or by proxy at all meetings of the stockholders without distinction among the classes of stockholders. Claimants were interested to a limited extent in the profits of the association and were stockholders and members of the association. They are not general creditors of the association. In determining the withdrawal value of the several shares of stock persons having fully paid stock were given by the articles of association a permanent fixed book value, while persons holding installment stock had its value for withdrawal or holding fixed as provided by the articles of association once in six months. So long as the association continued in business, therefore, the full paid stock had a fixed value, while the installment stock had a withdrawal and holding value to be so determined.

The contract with the installment stockholders is as sacred and binding as that with the full paid stockholders. When the association ceased to exist as an association all contracts were equally incapable of being fulfilled, and equity now steps in to wind up its affairs and make a ratable distribution of its assets among its members. The general principles relating to the distribution of the assets of insolvent building and loan associations are well stated in the Cyclopedia of Law and Procedure (Vol. 6, p. 165), as follows: "After the ordinary costs of winding up the association are paid, interested parties occupying the position of general creditors are entitled to be paid in preference to those whose claims are founded upon the relation which they sustain to the association as members thereof, unless the irregular acts of the creditor caused the insolvency; but the courts are inclined to treat the rights of all those holding the relation of stock-holders as equal and to allow no priorities in their claims. This is true, notwithstanding the stock-holder has given notice of withdrawal, although such notice has matured and he has received orders from the treasurer for the payment of the withdrawal value of his stock; but where the rules and by-laws of the association are held to govern the distribution in insolvency, the same as when the association was a going concern, the rule may be otherwise." An application of the principles thus stated to this case sustains the order of the Special Term. The claimants assert that from the articles of association it should be held that it was the

intention of the incorporators to give to the claimants a preference in the distribution of the assets in case of insolvency. We do not agree with the claimants that the articles of association relating to the determination of the withdrawal value of stock was intended in any way to affect the question of the distribution of assets in case of insolvency. Claimants also assert that the word "guaranteed," used in connection with classes E and K stock, must refer to the payment of the principal in any event. It is not at all clear what, if anything, was intended by the use of the word "guaranteed" in connection with such stock. It would seem to refer to the income thereon, but there being doubt about the income being absolutely guaranteed the word may have been used with reference to the withdrawal value of such stock while the association continued in existence. To find that any particular class of stock should have preference in the distribution of assets in the case of insolvency, the articles of association should so state in a plain and positive manner free from ambiguity and doubt. Questions may arise as to the withdrawal value of the several classes of installment stock at the time this action was commenced, but as the articles of association do not provide how the funds shall be distributed in case of insolvency, equity requires that the withdrawal value of the stock at the time the action was commenced should be the basis upon which the assets of the association should be proportionately distributed. The following cases among others sustain the conclusion herein reached: *Coltrane* v. *Baltimore B. & L. Association* (110 Fed. Rep. 281); *Coltrane* v. *Blake* (113 id. 785); *Alexander* v. *Southern Home B. & L. Association* (110 id. 267); *Solomons* v. *American B. & L. Association* (116 id. 679); *Gibson* v. *Safety Homestead & Loan Association* (170 Ill. 44); *Mutual Union L. & B. Assn.* v. *Stolz* (93 Ill. App. 164); *Hohenshell* v. *Sav. & Loan Assn.* (140 Mo. 566); *Leahy* v. *National Building & Loan Association* (100 Wis. 555); *Coltrane* v. *Baltimore B. & L. Association* (110 Fed. Rep. 272); *Towle* v. *American B. & L. Association* (75 id. 938); *Teller* v. *Wilcoxen* (110 Iowa, 565; 81 N. W. Rep. 772); *Bingham* v. *Marion Trust Co.* (27 Ind. App. 247; 61 N. E. Rep. 29); *Criswell's Appeal* (100 Penn. St. 488); *Strohen* v. *Franklin S. & L. Association* (115 id. 273).

We do not think that the Special Term so abused the discretion

vested in it in regard to the payment of disbursements as to require interference by this court. The order should be affirmed, without costs to either party.

Order unanimously affirmed, without costs to either party.