COLTRANE v. BALTIMORE BUILDING & LOAN ASS'N OF BALTIMORE CITY.

In re TWINING et al.

(Circuit Court, D. Maryland.   June 17, 1901.)

1. BUILDING AND LOAN ASSOCIATIONS—DISTRIBUTION OF ASSETS IN INSOLVENCY —STATUS OF HOLDERS OF FULL-PAID STOCK.
    A building and loan association, having the power to do so, issued what was called "full-paid stock," the subscribers for which paid in the full par value in cash, and were entitled to receive and were paid interest or dividends thereon semiannually at a fixed rate. Installment stock was also issued, on which no interest or dividends were ever credited or paid. The holders of both classes of stock were entitled to withdraw on giving a stated notice, and on such withdrawal holders of full-paid stock received back what they had paid in, and holders of installment stock the amount paid in, with interest. Both classes of stock carried the right to vote and to participate in the management of the association, without distinction between them. *Held*, that the holders of full-paid stock were stockholders, and not creditors, and, on the winding up of the association in insolvency, were entitled to no preference in payment over the holders of the installment stock.

2. SAME.
    Holders of full-paid stock issued by a building association as authorized by its by-laws, who have received interest on the same at a fixed rate as provided by its terms, cannot question the legal authority of the association to issue such stock after its insolvency, in order to establish their status as creditors instead of stockholders, and entitle them to a preference over other stockholders in the distribution of the assets.

3. SAME—RECOVERY OF DIVIDENDS PAID.
    After a building association has become insolvent, and its affairs are being wound up and its assets distributed by a court of equity, holders of full-paid stock who have received fixed dividends or interest thereon in accordance with their contract cannot be required to refund the same, or be charged with the amount so received in such distribution, although the other stockholders have received no dividends; but, for the purpose of fixing the amount of the claims of each class of stockholders, interest should be computed on the full-paid stock from the date of the last payment to the time the proceedings were instituted, and upon the amount paid in by each holder of ordinary or installment stock for the average time it was held by the association, at the rate fixed by the by-laws in case of withdrawal.

In Equity. In the matter of the intervening petitions of S. Fannie Twining and Eunice A. Pearce. On exceptions to report of John C. Rose, special master.

The hearing before the special master was at the instance of the petitioners, Mrs. Twining and Mrs. Pearce, who are holders of the so-called full-paid stock of the Baltimore Building & Loan Association of Baltimore City. The matter came on to be heard before the special master upon the issues raised by the petitions of Mrs. Twining and Mrs. Pearce. These petitions alleged that the petitioners, as holders of the full-paid stock, were entitled to be paid out of the assets of the association the full par value of their stock before the holders of any other classes of stock could be paid anything on account of such other stock. On the 21st day of March, 1901, the special master filed his report, in which he set forth his conclusions in 84 findings of fact and in 9 conclusions of law. The substance of such of the findings of fact as are at all material to the questions raised by the exceptions filed by the petitioners to the special master's report may be stated as follows: The Baltimore Building & Loan Association is a Maryland corporation, incorporated under the general incorporation laws of that state. It has always, from its first incorporation, issued, among other classes of stock, a full-paid stock. Persons subscribing for such stock paid for it its full par value in cash at the time of their subscription. Upon such stock issued in the earlier years of the association's operations the association undertook to pay and did pay 8 per cent. per annum interest or dividend, payable semiannually. On full-paid stock issued in the later years of the association's existence it contracted to pay, and did pay, 6 per cent. per annum, payable semiannually. The petitioners are the holders of full-paid 8 per cent. stock, for which they paid full par value, and upon which they received 8 per cent. interest or dividends. The original by-laws adopted by the association provided for the issue of such stock, which provision, with the difference above mentioned as to the rate of interest or dividend, has, in substance, been retained in all subsequent revisions of the by-laws. No profits were ever apportioned among any of the shares of the installment stock, or credited to the account of any installment stockholder. Installment stockholders who withdrew their stock during the existence of the association received back from the association what they had paid in to it on account of such stock, together with 6 per cent. interest for the average time their money had been in the possession of the association. The holders of full-paid stock participated equally with the holders of the installment stock in all stockholders' meetings, and the holders of full-paid stock were eligible to be elected, and in one case at least were elected, directors of the association. One of the intervening petitioners had been herself represented by proxy at several of the stockholders' meetings of the corporation. The total number of shares of stock issued by the defendant corporation never equaled the number of shares it was authorized by its charter to issue. The association had been in fact insolvent since January 1, 1900, and a receiver for it was appointed by this court on the 21st of March, 1900. The special master's principal conclusions of law, with his reasons in support of them, were in substance as follows:

"First Conclusion of Law. That, if the defendant corporation had the legal power to make the contracts it assumed to make with the intervening petitioners, the latter became, and still are, stockholders in the defendant corporation.

"Reasons in Support of the First Conclusion of Law. The intervening petitioners, over their signatures, applied for membership in the Baltimore Building & Loan Association of Baltimore City, and subscribed for a definite number of shares of its full-paid stock. The defendant corporation received their applications, subscriptions, and money. It issued to them certificates that they were entitled to the number of full-paid shares of its stock for which they had paid, and that such shares were transferable on the books of the company in person or by attorney. These certificates bore on their face the statements that they were full-paid and nonassessable, and that the shares were $100 each. All this is the familiar language of the stock certificates of most stock companies. Each of those issued by the defendant corporation further declared: 'This certificate redeemable six [or twelve] months after date, subject to the provisions of the by-laws of the association. Thirty days' notice of intention to redeem being nec-

essary.' Such a provision is usually, in substance, with more or less variation of phrase and detail, to be found on the stock certificates of building associations. 'The mere naming of a thing does not make it that which it is named, if in fact it is something else.' Heller v. Bank. 89 Md. 611, 43 Atl. 800. But, when you are trying to find out what the parties did, it may often help you to find out what they thought they were doing. In re Guardian Permanent Ben. Bldg. Soc., 23 Ch. Div. 462. The so-called certificates of stock contained another statement which is said to show that, whatever the parties called them, they were not in fact certificates of stock at all, and the persons who held them were not stockholders. The statement in question was: 'This certificate bears eight per cent. interest, payable semiannually July and January.' Stock does not bear interest. When reference, however, is had to the by-laws under which the certificates were issued, it appears that the semiannual payments to be made on the full-paid stock are in the by-laws always called 'dividends,' and never 'interest.' The use of the latter word in the certificate seems to have been merely a blunder of the officials charged with their preparation. Even if the word 'interest' was intentionally used, the argument of the intervening petitioners that the papers thereby show on their face that they are not certificates of stock, but are evidences of indebtedness, is not convincing. If stock does not bear interest, it is equally true that no binding contract can be made in Maryland to pay eight per cent. interest. Nor is there anything in any of the by-laws of the defendant corporation which as much as suggests that the holders of the full-paid stock are anything other than stockholders. They were allowed to vote at stockholders' meetings, and many of them, including one of the intervening petitioners, did vote, at least by proxy. They were eligible to be elected to office, and they were so elected. It is true that they received a definite dividend on their stock, and would not have been entitled to any more, no matter how great the profits of the defendant corporation might have turned out to be. But such a contract between corporations and the holders of certain classes of their stock is not uncommon. 1 Cook, Corp. § 269; Hamlin v. Railroad Co., 24 C. C. A. 271, 78 Fed. 670. 36 L. R. A. 826; Mercantile Trust Co. v. Baltimore & O. R. Co. (C. C.) 82 Fed. 365; Birch v. Cropper, In re Bridgewater Nav. Co.. 14 App. Cas. 525. It has never been held that this limited right of participation in profits was inconsistent with the status of stockholders. In this case the holders of such of the full-paid stock as was issued early in the history of the association bargained for eight per cent. per year. to be paid them semiannually, before the installment stockholders received anything. If the association had been uniformly successful, it is true that the holders of installment stock would have obtained about ten per cent. per annum. Such associations are not always successful. In the light of the experience of this and other associations of a like kind, it is impossible to argue that the share of profits which the holders of the paid-up stock were to receive was so small that it could not be reasonably supposed that they would have been willing to have assumed the liabilities of stockholders. Not a cent of interest or dividends has ever been paid on any share of installment stock now outstanding, while the intervening petitioner Mrs. Pearce has received one thousand one hundred and seven dollars and eleven cents ($1,-107.11) as dividends, equivalent to a little more than fifty-five per cent. on her original investment. There is no question that if the holders of the full-paid stock were stockholders, and nothing more. the defendant corporation would have had no power to pay them their eight or their six per cent. dividends out of anything but its profits. The intervening petitioners say that in the by-laws and certificates of stock there is no limitation or qualification of the undertaking to pay these dividends. If this were true, the sufficient answer would be that the law forms a part of all contracts. No one can take stock without being charged with notice of the fact that the corporation's promise to pay a dividend upon it is subject to the condition imposed by law that the dividend shall have been first earned. The contention of the intervening petitioners on this point does not, however, appear to the undersigned to be well founded in fact. The by-laws of the defendant corporation show that the dividends on the full-paid stock were

to be paid out of the earnings or profits, and their payment out of anything else was in effect forbidden. In discussing the soundness of this conclusion of law it is not necessary to consider whether by the contract between the association and the holders of full-paid stock such holders were, in the event of the insolvency of the association, entitled to receive back the par value of their stock before anything was payable to the holders of installment stock. That question will be considered in connection with the eighth conclusion of law. The holders of full-paid stock might have such a preferential right, and still be stockholders and not creditors. Hamlin v. Railroad Co., 24 C. C. A. 271, 78 Fed. 670, 36 L. R. A. 826.

"Second Conclusion of Law. That the defendant corporation had lawful power at the respective times at which it issued stock to the intervening petitioners to issue the number of shares of stock which it did in fact issue.

"Reasons in Support of the Second Conclusion of Law. By the amended certificate of incorporation the defendant corporation was authorized to issue not exceeding two hundred and fifty thousand (250,000) shares of its capital stock. The aggregate number of shares issued by it from first to last did not exceed one hundred and fifty thousand (150,000).

"Third Conclusion of Law. That the laws of Maryland do not prohibit a building association from accepting from its members the payment in advance of some or all of the installments to become due upon their stock.

"Reasons in Support of the Third Conclusion of Law. By section 95 of article 23 of the Maryland Code of Public General Laws, a building association is authorized to 'regulate the installments to be paid on each share provided the same shall not exceed the sum of $1 per share per week, and the times at which the same shall be payable.' There is in this matter no other restriction upon the power of the association. It very possibly could not compel the payment of dues in advance if the effect was to make a member pay more than $1 in any one week on any one share of its stock. There is absolutely nothing, however, to prevent the member from offering and the association from accepting payments in advance if both parties desire so to do. It has been a common practice of building associations in this state to accept dues in advance when the members wished to pay them in that way. There seems no difference in principle between accepting some dues in advance and accepting at one time the payment in advance of all the dues.

"Fourth Conclusion of Law. That, when the stock of a building association is or becomes full paid, the holder thereof does not necessarily, under the Maryland law, cease to be a stockholder in the association.

"Reasons in Support of the Fourth Conclusion of Law. Some of the authorities in other states have held that when the stock of a building association becomes fully paid up or matured the holder of such stock ceases to be a member of the association, and becomes a creditor. Eversman v. Schmitt, 53 Ohio St. 184, 41 N. E. 139. It is not necessary to discuss these authorities. It is sufficient to say that in Maryland it has been expressly decided that the holders of full-paid stock are still stockholders in the association, and that their stock is still outstanding as stock. Tax Cases, 50 Md. 320.

"Fifth Conclusion of Law. That the intervening petitioners cannot now question the legality of the issue of stock to them by the defendant corporation on the ground that the said defendant corporation had no legal authority to promise to pay to them semiannual dividends at the rate of eight and six per cent. on the par value of their stock.

"Reasons in Support of the Fifth Conclusion of Law. The corporation did not, as has been seen, by the issue of the stock subscribed for by the intervening petitioners, exceed the number of shares it was authorized to issue. It is not necessary in this case to decide whether it would have been in the power of any stockholder of the defendant corporation to have prevented, by apt legal proceedings seasonably taken, the issue of full-paid stock. No such attempt was made. In the original by-laws of the association provision was made for the issue of this stock. In the organization of the corporation holders of full-paid and of installment stock participated. There is nothing in the law of Maryland which expressly prohibits the is-

sue of stock with the rights and attributes of the full-paid stock issued by the defendant corporation. It is true that section 294 of article 23 of the Maryland Code of Public General Laws provides how the preferred stock issued as prescribed in that section of the Code can be made a lien on the property and franchises of the corporation. But no attempt was in this case made to issue any such stock, or to give it any such rights and privileges. Stock issued with the formalities of record and otherwise provided for in that section has a lien upon the property and franchises of the corporation superior to that of its creditors. No such stock could be given such properties without compliance with all the requirements of that section. It does not follow, however, that because the legislature provides for that peculiar kind of preferred stock, and says how that kind of preferred stock shall be issued, it is to be understood as prohibiting the issue of all other kinds of preferred stock. It certainly does not follow that formalities prescribed largely, if not altogether, for the purpose of protecting creditors, must necessarily be followed before there can be validly issued a stock by the issue of which the rights of creditors could not possibly be affected. In Maryland, therefore, there is no statute either expressly authorizing or prohibiting the issue of such stock as was issued by the defendant corporation to the intervening petitioners. Under such circumstances, when the stock was, as in this case, issued contemporaneously with the original inception of the enterprise, the overwhelming weight of authority holds that the issue is within the corporate powers. 1 Cook, Corp. 268; People v. Preston, 140 N. Y. 549, 35 N. E. 979; In re South Durham Brewery Co., 31 Ch. Div. 261; Lockhart v. Van Alstyne, 31 Mich. 76, 85, 18 Am. Rep. 156. Nor is there any reason why this general rule of law should not be held applicable to building societies. Sir George Jessel, with that vigor and clearness of thought and statement which so eminently characterized him, said on this very subject: 'I do not think it the province of the judicature to find out things to be inconsistent with the ordinary requirements of mankind which the people themselves have not found out. It is all very easy for people to say it is against the policy or against the meaning of these societies; but when you see that people who have established the society do not think so, and have acted on a contrary view, it is very improbable that it is contrary to the nature of the society, and contrary to the objects the members have in view. But, besides that, I cannot see any reason why it should be so.' In re Guardian Permanent Ben. Bldg. Soc., 23 Ch. Div. 464. If in the face of all this high authority it should be assumed that the association was not authorized to classify its stockholders, who can complain? Obviously only those persons who were or who might have been injured by such classification. Creditors of the corporation could not have objected. They were not concerned, directly or indirectly, in the manner in which the stockholders of the defendant corporation divided its profits among themselves. The question as to in what manner and in what proportions the defendant corporation should divide its profits among its stockholders is one in which nobody but those stockholders themselves are interested. It appears that from the beginning of the association paid-up stock was issued under the same terms as those under which the stock held by the intervening petitioners was issued. No objection to such issue was ever made by anybody prior to the appointment of receivers in this cause, which was nearly nine years after the original formation of the association. It is true that on one occasion a redeemed installment stockholder, who had, however, been previously a holder of full-paid stock, did in certain legal proceedings contend that the issue of paid-up stock with a fixed rate of dividend took from the corporation its purely mutual character, and therefore subjected the contracts between it and its borrowers to the same rules of law as those to which ordinary contracts of borrowing and lending between strangers are subject. It will be noticed, however, that even in this case no question was raised as to the legality of the issue of the stock, or of the agreement to pay the dividends in question. Indeed, it was assumed that such stock was legally issued, and that the contract to pay the dividends was a legal contract. From that assumption it was sought to deduce certain legal consequences. It is now too late for the intervening petitioners to

question the binding force upon them of the contract actually made. There is a well-recognized distinction between those contracts which a corporation has no power to make, and the doing in an irregular way of those things which the corporation has the power to do. In the latter class of cases the contract is binding upon the corporation and its stockholders who have acquiesced with knowledge in the irregular proceedings, and have acted upon and taken benefits under them. Scoville v. Thayer, 105 U. S. 154, 26 L. Ed. 968; Kent v. Mining Co., 78 N. Y. 159; Branch v. Jesup, 106 U. S. 468–481, 1 Sup. Ct. 495, 27 L. Ed. 279.

"Sixth Conclusion of Law. That the payments made as dividends to the intervening petitioners, or any of them, by the defendant corporation, cannot now be recovered back from the intervening petitioners.

"Reasons in Support of the Sixth Conclusion of Law. The court of appeals of Maryland has declared that a building association 'is bound to treat its members equally,' and any 'by-law or contract made by it in contravention of such mutuality would be ultra vires and void.' Baltimore Building & Loan Ass'n v. Powhatan Imp. Co., 87 Md. 64, 39 Atl. 274. It has been suggested by counsel representing some of the installment stockholders that when the defendant corporation paid dividends to the holders of full-paid stock, and paid none to the holders of installment stock, it did not treat all its members equally, and that consequently the by-laws and contracts providing for such payments were, in the language of the court of appeals, 'ultra vires and void.' It is significant, however, that in the very case quoted the court of appeals had the by-laws of this particular association before it, and while it certainly had no occasion directly to pass upon the validity of the issue of this full-paid stock, and of the promise to pay fixed dividends upon it, it is quite obvious that it did not strike the court of appeals that such provisions were in any wise invalid or improper. However this may be, this is a case where, for the same reasons as those set forth under the previous conclusion of law, it is now too late for the installment stockholders to attack the payments of dividends which have been made to the holders of full-paid stock. When the by-laws were adopted the holders of the installment stock supposed that their returns from their investment would be considerably greater than those which would go to the holders of the full-paid stock. It has turned out that they will not be. But the holders of the full-paid stock, in agreeing to accept and in accepting the dividends they did in lieu of all other share of the profit, gave full consideration for the payments which were made to them. They were to get all their dividends semiannually. The holders of the installment stock, if for any reason their stock was paid off before its maturity, were to get six per cent. interest for the average time the association had their money. If their stock was not paid off until it matured, they were to get their full share of all the profits of the association, no matter how great the latter might have been. The holders of the full-paid stock had the right to collect semiannually some part of their claim against the association. They have collected it. They cannot now be required to account for it, although, of course, its payment necessarily reduces the amount of their claim against the association. Had it not been collected they would now have a right to ask the association for the amount of their stock, with interest or dividend upon it for all the time the corporation held it. The interest or dividend upon it has been paid to the 1st of January, 1900, and consequently their claim against the association is only for the par value of their stock, with interest on such par value from the 1st of January, 1900, to the 21st of March, 1900, when the association passed into the hands of the receivers. The person who succeeds in securing the payment of some part of his claim before the corporation becomes insolvent has simply reduced his claim by the amount of such payment. In the absence of fraud or of such an unlawful preference as might be cognizable in a court of bankruptcy, he cannot be required to account for that which he was entitled to get if he could, and which, when he did get it, became his.

"Seventh Conclusion of Law. That there is nothing in the by-laws of the defendant corporation, or in the certificates of stock issued by it to the intervening petitioners, which promises to the latter payment of either the

par or the withdrawal value of their stock out of the assets of the defendant corporation in preference to the payment to the holders of installment stock of the withdrawal value of such installment stock.

"Reasons in Support of the Seventh Conclusion of Law. The intervening petitioners claim that the by-laws of the defendant corporation and the certificates of stock it issued to them give them the right to be paid in full out of its assets before the holders of the installment stock are entitled to be paid anything. They rely upon the following provisions of the by-laws, viz.: 'Holders of paid-up stock can never be assessed or called upon for any payments other than the $100 per share for which such stock is sold, and in withdrawing it will receive the full $100 on each share, with interest up to the date of withdrawal.' So much of the above-quoted by-law as declares that the holders of paid-up stock can never be assessed or called upon for any payments other than the $100 per share for which such stock is sold has no bearing upon the matter in hand. It is merely one way of saying that the stock is full-paid and nonassessable, as of course it was. The defendant corporation had received its full par value in cash, and by the law of Maryland there was no further liability upon its holders. The other portion of the by-law quoted, viz. that which says that holders of the paid-up stock 'in withdrawing it will receive the full $100 on each share, with interest up to the date of withdrawal,' is an agreement binding upon the defendant corporation. The defendant corporation, however, has made other agreements also binding upon it. It has undertaken to pay to the holders of installment stock issued prior to July 1, 1896, upon withdrawal, 'the amount paid on such shares, together with a dividend thereon at the rate of six per cent. per annum for the average time.' The question to be determined, therefore, is not whether the association has bound itself to pay to the intervening petitioners what the latter claim, for, assuming the contract to be valid, there is no doubt that it has, but whether there is anything in the contracts it made with the installment stockholders to distinguish those contracts from the contracts it made with the holders of paid-up stock. If there be no such distinction, the case presented is simply the common one of an insolvent corporation having bound itself to pay more than can be realized from its assets. If that is the whole situation, of course the familiar doctrine that equality is equity must control. The holders of the full-paid stock assert, however, that there is a distinction between the contracts held by them and the contracts held by the installment stockholders. They say that by a proper construction of the by-laws all losses are to be charged to the installment shares. The provision of the by-laws referred to reads as follows: 'If the undivided profits on hand at any time are not sufficient to pay any loss that may occur, the balance shall be charged up to the shares in good standing pro rata in proportion to the value thereof; and, if any share is withdrawn, the amount so charged will be deducted from the amount due on such share.' It will be perceived that the application of this by-law is not by its terms limited to the installment stock, but is broad enough to cover all classes of stock. The intervening petitioners contend, however, that this by-law has always formed part of the article devoted to withdrawals; that many of the provisions of the article on withdrawals are applicable, and only applicable, to installment stock; and that therefore no part of such article has any application whatever to any stock but installment stock, and, as a consequence, that the by-laws intend that all losses shall be charged to the installment stock. I have not been able to see that their contention is well founded.

"Eighth Conclusion of Law. That the intervening petitioners are not entitled in the distribution of the assets of the defendant corporation to any preference or priority over the holders of installment stock.

"Reasons in Support of the Eighth Conclusion of Law. If the preceding conclusions of law are correct, the defendant corporation did not promise to the holders of full-paid stock that they would have any preference over the other stockholders in the event that the distribution of the assets of the corporation among its stockholders should, by reason of insolvency or otherwise, become necessary. Under such circumstances the unquestioned rule

of law is that the holders of preferred stock are not entitled, in the event of a dissolution of the corporation, to any preference in the return of their capital over the holders of common stock. 1 Cook, Corp. § 278; 2 Beach, Corp. § 507; Birch v. Cropper, In re Bridgewater Nav. Co., 14 App. Cas. 525; In re London India-Rubber Co., L. R. 5 Eq. 519; McGregor v. Insurance Co., 33 N. J. Eq. 181. How unbending this rule is appears from the decision in the matter of the London India-Rubber Company, above cited. In that case the promoters of the company had received considerable stock in return for certain patent rights. They had contributed no money, and, as it turned out, nothing else of any real value, to the corporation. All the capital had been furnished by the holders of preferred stock. 'Yet the articles did not provide for any preference in the distribution of capital of preferred over common stockholders, and the court with great reluctance held that, in spite of the actual inequity of the application of the rule to the facts of the particular case, it must be so applied. The intervening petitioners in this case have not the equities with them. They and the other holders of paid-up stock have alone among the present shareholders of the corporation received from it anything. Some of them who have held stock for a number of years, it may be, have already received back nearly, if not quite, as large a proportion of the money paid in by them as it will now be possible to return to the installment stockholders, even provided that the paid-up stockholders are held not to be entitled to any preference. If the full-paid stockholders are given the preference for which they ask, it is possible that the holders of installment stock will receive nothing at all. The net result in that event would be that the very classes for whom building associations exist would lose all they had out of their monthly savings contributed to it, while the better to do, who had taken paid-up stock, would get all they put in, with interest. Building associations, of late years, especially, have very commonly issued full-paid stock. In one reported case, if not more, there was an express contract that in the event of the dissolution of the corporation the paid-up or preferred stockholders should be preferred in the distribution of capital. In that case, of course, there was nothing to be done but to give them the right for which they had bargained. It may be worth while to quote the language of the rules of the association referred to, for the purpose of showing how easy it is to make the right to such a preference perfectly plain, and by comparison to show how far short of declaring any such preference the by-laws of the Baltimore Building & Loan Association stopped. By the rule of the English society a holder of the paid-up share had a right to withdraw the whole or part of his deposit in preference to all other shares. It was further provided that if a loss should arise the board should direct a levy of such sum on every share as would cover all deficiency, provided that no levy of any sum should be made on or in respect of any paid-up share. In re Guardian Permanent Ben. Bldg. Soc., 23 Ch. Div. 440. In one building association case in this country the court said that paid-up stock issued under similar terms to that of the defendant corporation was not stock at all, but that the so-called stock certificates were really evidences of debt. This was the case of Cook v. Association, 104 Ga. 828, 30 S. E. 911. In that case, however, the status of the full-paid stock was only incidentally before the court. A borrowing member who had paid a premium in addition to the legal rate of interest on his loan had alleged that such payment was usurious. In Georgia it had been previously decided that premiums might be lawfully charged by building associations which were purely mutual. The borrowing shareholder in this case sought to escape the effect of those decisions by setting up the claim that this association, having shareholders who were to get a fixed rate of interest in any event, was not a purely mutual association, but was really, in part at least, a mortgage loan company. It was under these circumstances that the court held that the so-called paid-up shareholders were not shareholders of the corporation, but were its creditors. The United States circuit court for the Northern district of Georgia, when the same question as that which is now before this court was presented to it in the recent case, decided on the 8th of November last, of Alexander v. Association, 110 Fed. 267, held that the full-paid stock

was not entitled to any preference or priority, but that in the distribution of the assets of the corporation it should participate in proportion to its par value, and the installment stock in proportion to the withdrawal value of the latter. As to the installment stock, the undersigned has already, in the matter of the intervening petition of Charles G. Blake, made a like report. The federal court sitting in the same state, and winding up a Georgia corporation, did not conceive itself bound by what the state court said in the case of Cook v. Association. Wherever else the question has directly come before the courts in this country the decisions have been of like effect. Hohenshall v. Association, 140 Mo. 566, 41 S. W. 948; Gibson v. Association, 170 Ill. 46, 48 N. E. 580; Leahy v. Association, 100 Wis. 555, 76 N. W. 625. The same rule has been laid down by the federal circuit courts of three circuits, viz.: Circuit court for the Northern district of Illinois, in Towle v. Association, 75 Fed. 938; circuit court for the Western district of Missouri, in Latimer v. Investment Co., 81 Fed. 776; and, as before stated, the circuit court for the Northern district of Georgia in Alexander v. Association, decided on November 8, 1900. I can find in this country no decisions to the contrary; nor is the English rule different, except that in England the power of an association to give a preference in distribution of its capital to its full-paid stock is recognized and enforced, when such preference is clearly and unequivocally given. The American decisions suggest at least that they would hold that the corporation had no power to give such preference, even if it had clearly attempted so to do. If the construction which in this report has been placed upon the certificates of stock and by-laws of the defendant corporation is correct, it is not necessary in this case to inquire whether such a preference would have been valid had the association sought to give it. In End. Bldg. Ass'ns, § 514, it is said, 'Nor, again, is there any room for question * * * that holders of priority or preference stock are to be preferred' to ordinary members. It appears, however, from the authority cited by the learned author, namely, Murray v. Scott, 9 App. Cas. 519, that by 'priority or preference' shares he means shares which have been issued under an express contract that they shall be preferred in the distribution of assets in the event of winding up. None of the American cases in which the question now before us has been considered had been decided when the last edition of Endlich went to press. Thomp. Bldg. Ass'ns (2d Ed.) § 128, also says that upon the winding up of the affairs of the association in the hands of a receiver the holder of paid-up stock is entitled to recover the amount advanced by him ahead of the other members. The American authorities which the learned author cites in support of this proposition in fact decide precisely the opposite, while in the English case upon which he relies (Murray v. Scott, 9 App. Cas. 519) the preference was expressly bargained for.

"Ninth Conclusion of Law. That a decree should be passed by which it should be ordered, adjudged, and decreed that the amount of the claims of the said intervening petitioners, respectively, against the defendant corporation, was on the 21st day of March, 1900, the par value of the stock held by them, with interest thereon from January 1, 1900, to March 21, 1900, and that neither of the said intervening petitioners is entitled to be paid the amount of their said respective claims, or any part thereof, in preference to the payment to the installment stockholders of the amount paid in by said installment stockholders, respectively, as dues upon their said stock, with interest thereon for average time to the 21st day of March, 1900, but that the said intervening petitioners and the said installment stockholders shall, in proportion to their said respective claims, share equally in the distribution of the assets of the said defendant corporation, and that it should be further ordered, adjudged, and decreed that the costs of these intervening petitioners shall be paid by the receivers of the said defendant corporation out of its assets.

"Reasons in Support of the Ninth Conclusion of Law. On the 21st of March, 1900, had the defendant corporation been then a going concern, and had the intervening petitioners on that day withdrawn their stock, it would have been bound to pay to them the par value of their stock, with eighty days' interest thereon; that is, interest from the 1st day of January, 1900, up to

110 F.—19

which time they had received their dividends, to the 21st day of March, 1900. Now, they did not withdraw their stock on the 21st of March, 1900, but on that day the defendant corporation went into the hands of receivers, to be wound up. In legal effect, what happened on the 21st day of March, 1900, was equivalent to the compulsory withdrawal of all the members. Opinion of the Earl of Selborne in Brownlie v. Russell, 8 App. Cas. 235. It follows that on the 21st of March, 1900, the defendant corporation would have been bound to pay to the holders of the installment stock the amount paid in on such stock, with interest thereon for the average time the association had had the money. In adjusting the equities between the different classes of stock, and between the holders of the same class of stock who became holders at different times, there seems no fairer way than to follow the rules laid down by the association itself, and acquiesced in by all its members. By these rules the claim of the installment stockholders when they withdrew was not only for the amount they had paid in, but for interest thereon for the average time the association had had their money. This rule has a peculiar equity in this case, where the holders of the paid-up stock have already received an equivalent, and in some cases more than the equivalent, of this interest in full. Its allowance to the installment stockholders now will allow to them only the dividend they will receive upon it. The rule here followed is that adopted by the United States circuit court for the Northern district of Georgia in the recently decided case of Alexander v. Association. It is eminently fair, for it simply says that every stockholder shall be entitled to prove his claim against the association for that amount which the association promised to pay him. The association cannot keep its promise to him in full, but it must come as near doing it in the case of one of its stockholders as in the case of any of the others. A question could be raised as to what was the withdrawal value of the installment stock issued subsequent to July 1, 1896. By the terms of the by-laws such stock, if withdrawn before thirty-six months' installments had been paid upon it, would be entitled to receive back but five-sixths of what had been paid in upon it, without interest. When the holder of stock upon which not less than thirty-six nor more than forty-eight installments had been paid withdrew it, he was entitled to get back all that he had paid in, without interest. Upon the withdrawal of stock upon which forty-eight or more payments had been made, the holder was entitled to receive the full amount paid in, with interest for the average time. The insolvency of the defendant corporation has, without the consent of the holders of any of the installment stock, caused all of it to be practically withdrawn as of date of March 21, 1900. Under such circumstances, it seems most equitable to treat all the installment stock alike, and to hold that the withdrawal value of all of it is the amount paid in on it, with interest for the average time."

The intervening petitioners excepted to the first, fourth, fifth, seventh, eighth, and ninth conclusions of law.

Henry A. Whitaker, James Hewes, and Henry C. Kennard, for intervening petitioners.

Fielder C. Slingluff, for Baltimort Building & Loan Association.

Richard S. Culbreth, for complainant.

Thomas Foley Hisky and Morrill N. Packard, for certain holders of installment stock.

MORRIS, District Judge. The conclusions of the special master may be summarized as follows: (1) Holders of the paid-up stock are stockholders of the defendant corporation, and are not its creditors. The defendant corporation had power to issue paid-up stock, and the holders of that stock cannot now question that it had such power. (2) Neither the corporation nor the holders of other classes of stock can now recover back from the holders of the paid-up stock the interest or dividend which has been heretofore paid the holders

of such paid-up stock.    (3) Neither the by-laws nor the certificates of paid-up stock provide that the holders thereof shall be paid in full in preference to installment stockholders in the distribution of the assets of the corporation.    Holders of paid-up stock are not entitled to any preference over the holders of installment stock.    Distribution is to be made pro rata between both classes alike.    Interest to be calculated on the paid-up stock from the date of the last payment of interest or dividend upon it, and on the installment stock for the average time the association has held the money paid in on such installment stock.

Counsel on behalf of the paid-up stockholders have, with great earnestness and industry, urged upon the court that the report of the special master denies to them rights to which they are entitled by the contracts made between them and the association.  It is admitted that, in most of the cases in this country in which holders of paid-up stock in insolvent building associations have asserted a claim to preferential payment out of the assets, their right so to do has been denied by the courts.    It has been here argued, however, that the contracts in such cases could be distinguished from those at bar.    In argument much reliance was placed by the counsel for the paid-up stockholders upon the decision of the supreme court of Georgia in the case of Cook v. Association, 104 Ga. 815, 30 S. E. 911. The special master has pointed out in his report that the United States circuit court for the Northern district of Georgia has, in the recently decided case of Alexander v. Association, 110 Fed. 267, declined to regard the decision in Cook's Case as conclusive of the point now in controversy.    It so happens that, three days before the exceptions to the master's report were argued before me, Judge Lumpkin, of the superior court of Georgia, who had presided at the trial of the case of Cook v. Association, was called upon, in the case of Robinson et al. against the Southern Mutual Building & Loan Association, to pass upon the question now before me.    The auditor had held that the holders of paid-up stock were creditors, having reached that conclusion because he felt himself controlled by the decision in the case of Cook v. Association.    Judge Lumpkin points out that the rights and status of the paid-up stockholders were only collaterally involved in the decision of Cook v. Association; that case having been, as the special master shows in his report, a controversy between a borrowing stockholder and the association as to the proper method of accounting between them.    Judge Lumpkin further calls attention to the fact that in Cook's Case not only had the holder of paid-up stock the right to withdraw it, but the association reserved the right to call it in or redeem it.    This right was not reserved by the defendant association in the present case.    Judge Lumpkin says:

"I should hesitate long before holding that a number of people can join a building and loan association, take shares in it (regardless of whether they pay in advance or by installments), call themselves 'shareholders,' have the privilege of voting as such, be subject to the by-laws, and in fact be part and parcel of a concern which has no right to exist and do business and make, loans on the usual plan of building and loan associations, without coming in conflict with the usury laws of the state, except on the basis of mutuality and equality, and yet, when the enterprise fails, discover that

they are creditors, with the right of priority of payment of the full amount of their share."

He adds:

"While the substance rather than the form is to be regarded in determining whether a certificate represents a debt or shares of stock, yet what the contracting parties call the paper, and what they intended and meant it to be, and the duties and rights conferred by them upon the holder of it, furnish indicia as to its nature."

I concur in these views. Nearly all building associations draw up their by-laws and make their agreements upon the assumption that they will succeed. They promise to each class of persons with whom they seek to do business those things which are likely to prove most attractive to people so situated. When disaster overtakes the association each class of its stockholders insists that the association shall be required to carry out its contract with them, no matter what happens to its agreements with the other classes of stockholders. In any such case, to enable any class of stockholders successfully to assert a right to be paid in full in preference to other stockholders, they must rest their claim upon a positive, unambiguous contract, specifically giving them that priority. A court of equity, when winding up an insolvent association and distributing its assets, is compelled to look at all the engagements into which the association has entered. If the association has undertaken to do more than its assets will enable it to do, the court must apportion its assets among those having claims upon it in conformity with the principles of equity. The court of appeals of Maryland, speaking of this defendant association, said:

"As a mutual association based on the mutual plan, it is bound to treat its members equally, and any by-law or contract made by it in contravention of such mutuality would be ultra vires and void. While we are of opinion that an examination of all the by-laws must be made to ascertain their meaning and effect, we must not allow too much weight to attach to any one alone, so that it shall unduly preponderate against the other." Baltimore Building & Loan Ass'n v. Powhatan Imp. Co., 87 Md. 59–64, 39 Atl. 274.

It does not seem to me that the contract of the paid-up stockholders in this case gives them the right to be paid in full in preference to the installment stockholders, and that to allow them to be so paid would be inequitable.

For these reasons, I will sign a decree overruling the exceptions and confirming the special master's report, and dismissing the petitions of the full-paid stockholders; the costs to be paid, in accordance with the recommendation of the special master, and for the reasons by him stated, out of the general assets of the association.