PEOPLE v. METROPOLITAN MUT. SAVINGS & LOAN ASS'N.

(Supreme Court, Appellate Division, Third Department.    March 8, 1905.)

1. BUILDING AND LOAN ASSOCIATIONS—INSOLVENCY—CLASSES OF MEMBERSHIP—PREFERENCE.

Where the articles of association of a building and loan association make no provision concerning the rights of members in the contingency of its insolvency, no particular class of members is entitled to preference in the distribution of its assets, in winding up its affairs as an insolvent concern.

[Ed. Note.—For cases in point, see vol. 8, Cent. Dig. Building and Loan Associations, § 88.]

2. SAME—INSTALLMENT STOCK—WITHDRAWAL VALUE.

Where the articles of association of an insolvent building and loan association, which issued installment stock, make no provision concerning the rights of members in the contingency of its insolvency, the withdrawal value of such stock at the time the action was commenced is the basis on which the assets of the association are to be proportionately distributed, in winding up its affairs.

Appeal from Special Term, Erie County.

Action by the people of the state of New York against the Metropolitan Mutual Savings & Loan Association. From an order confirming the report of the referee appointed to determine the questions raised by the claimants to a preference in the distribution of the assets of the defendant in the hands of its receiver, Delilah Good and others appeal.    Affirmed.

Appeal by Delilah Good and others, claimants, from an order of the Erie Special Term dated July 8, 1904, and entered in the office of the clerk of the county of Albany July 18, 1904, confirming the report of the referee appointed to determine the questions raised by the claimants to a preference in the distribution of the assets in the hands of said receiver, and from the whole of said order, excepting the part thereof denying costs, but directing that the receiver pay the disbursements of the reference.    Also an appeal by said receiver from so much of said order as directs him, from the funds in his hands, to pay said disbursements of the reference.

The Metropolitan Mutual Savings & Loan Association was organized in 1885, under chapter 122, p. 234, Laws 1851, and the acts amendatory thereof and supplemental thereto.    It did business until August 16, 1897, when all its liabilities were discharged and its assets distributed.    It was then reorganized, and new articles of association and by-laws were adopted, and it commenced business again at once, and continued business until May 1, 1902.    This action was then commenced, and on July 15, 1903, judgment was entered dissolving the corporation by reason of its insolvency.    A temporary receiver was appointed when this action was commenced, and he was subsequently continued as the permanent receiver.

By the articles of association adopted August 16, 1897, the purpose of the association was stated as follows:

"This association was and is incorporated for the purpose of accumulating a fund for the purchase of real estate, the erection of buildings, the making of other improvements upon lands, to pay off incumbrances thereon, to aid its members in acquiring real estate, making improvements thereon, and removing incumbrances therefrom; and for the further purpose of accumulating a fund to be returned to its members, who do not obtain advances as above mentioned, where the funds of the association shall amount to a certain sum per share as hereinafter specified, and for the transaction of the general business of a building, mutual loan and accumulating fund association."    Article 1, § 2.

The purpose thus stated is substantially the same as provided by section 1, c. 122, p. 234, Laws 1851.

The articles of association also provide:

"A member is the holder of a share in any class of stock and for each share so held he has one vote in person or by proxy at all meetings of the stockholders; but in funds, profits, or otherwise he has no interest beyond the par value of his shares." Article 1, § 4.

Said articles further provide:

"The capital stock is presently divided into shares of one hundred dollars each and into four general classes known as guarantee fund stock, common installment stock, prepaid, and fully paid stock, and common installment stock into four classes known as A, B, C, and D, respectively." Article 2, § 4.

On January 18, 1899, said section of said article was amended so as to read as follows:

"The capital stock is presently divided into shares of $100 each and into six general classes known as guaranteed fund stock, common installment stock, common installment loan stock, prepaid and fully paid stock, and real estate investment stock, and common installment stock into four classes known as A, B, C, and D, respectively, and the common installment loan stock into three classes known as L, M, and N, respectively."

Said articles further provide:

"On each share of common installment stock until maturity by the third business day of each month twenty-five cents must be paid on class 'A,' fifty cents on class 'B,' seventy-five cents on class 'C,' and on class 'D' one dollar." Article 2, § 5.

Said articles further provide:

"The par value ($100.00) of all classes of fully paid stock and the present value of prepaid stock must be paid at subscription and the association will issue its paid-up certificate therefor, bearing interest not exceeding six per centum per annum, or providing for a participation in profits payable out of general net earnings." Article 2, § 6.

On January 16, 1901, said section was amended by adding after the word "annum" the words "except class K."

Said articles further provide:

"Payments upon installment stock may be made in advance, and when so made for six months or more a discount will be allowed for the average time at such rate not exceeding six per cent. as the board of directors may determine." Article 2, § 7.

Said articles further provide:

"In addition to the issue of common installment stock in classes A, B, C, and D, the association may presently issue in shares of one hundred dollars each the following kinds and classes of stock: * * *

"Class E. A class to be known as guaranteed six per cent. income, the par value of which shall be paid at subscription, and in and by the terms and conditions thereof provide that the same cannot be withdrawn until after three years from the date of issue, and then only on thirty days' notice and agree within the provisions of its articles to pay a semiannual dividend thereon, on the first day of each July and January at a rate not to exceed six per centum per annum. * * *

"Class H. A class to be known as prepaid accumulative, of the present value of fifty dollars per share, to be paid at subscription, and in and by the terms and conditions thereof agree within the provisions of its articles to pay a semiannual dividend thereon, on the first day of each July and January, at a rate not to exceed six per centum per annum upon the amount then to the credit thereof, and provide that the shares cannot be withdrawn until after two years from the date of issue, and then only upon thirty days' notice, when the member shall be paid the withdrawal value thereof as last established. * * *"

Article 2, § 8.

Said section of said article was also amended on the 18th day of January, 1899, by adding in the first paragraph thereof, after the words "classes A, B, C, and D," the words "and common installment loan stock in classes L, M, and N," and also by adding class K, as follows:

"A class to be known as Class 'K,' seven per cent. income, the par value of which shall be paid at subscription and in and by the terms and conditions thereof, provide that the same cannot be withdrawn until after one year from the date of issue, upon sixty days' notice, the association reserving the right to call in any and all of this stock at any time after two years from the date of issue and agree within the provisions of its articles to pay a semi-annual dividend thereon, on the first day of January and July, at a rate not to exceed seven per centum per annum."

That part of said section relating to class H was amended by adding thereto the following:

"In addition to such cash dividends this stock will be credited with such profits as may appear to be its equitable share of the net surplus earnings of the association to mature it to its par value."

Said articles further provide:

"The books will be closed on the twentieth day of each December and June, and, within the next ten days, the net unapportioned profits will be ascertained and apportioned according to the conditions governing the several shares and classes of stock then outstanding, and the withdrawal and holding value of the installment shares and the prepaid stock established." Article 4, § 1.

"No profits, dividends, or interest on shares will be paid beyond the apportioned profits applicable thereto." Article 4, § 2.

"Before apportioning profits, the board of directors may set apart therefrom to a reserve fund a sum not greater than ten per cent. of the then unapportioned profits, to indemnify losses." Article 4, § 3.

Said articles also provide:

"After fully indemnifying the reserve fund as the board of directors may have resolved and the payment of losses and all general and operating expenses the balance then remaining is the loan fund, but all such expenses as far as may be will be paid out of the authorized attorney, appraisal, membership, withdrawal and transfer fees and such expense fund deductions from payments on shares as may be authorized by these articles." Article 5, § 1.

Provision was also made in the articles of association for permanent expense fund deductions on each share of the several classes of stock, including class H, "one dollar and fifty cents the first year and fifty cents per year thereafter," and on classes E, F, and G, "three dollars per share the first year and one dollar per share each year thereafter to be charged against general profits and credited to expense fund account. And in consideration of the fact that these classes of stock do not participate in the general profits beyond an ultimate fixed dividend although said deductions may be used for expenses the stock shall be carried as a liability at its par value."

By the amendment to the by-laws January 18, 1899, the provision for permanent expense fund, so far as it related to class H, was changed to read, "One and fifty one-hundredths per cent. of the par value the first year and one-half of one per cent. per annum thereafter of the par value to be paid out of earned profits thereon," and the provision in regard to classes E, F, and G was changed so as to read, "Three per cent. of the par value the first year and one per cent. per annum of the par value thereafter, and on class K, two per cent. of the par value the first year and one per cent. per annum of the par value thereafter charged against profits to said stock apportioned in classes E, F, G, and K, and credited to expense fund account, and in consideration of the fact that these classes of stock do not participate in general profits beyond the ultimate fixed dividends although said deductions may be used for expenses the stock shall be carried as a liability at its par value."

Said articles also provide:

"The shares of common installment stock, issued in any calendar month, will be matured as a series, and, at maturity, the holder will be paid the par

value thereof, but unpledged shares of such stock are withdrawable at any time before maturity, after two years from the date of issue, when, upon surrender of his certificate, the holder will be paid the full. amount of dues to the credit of the shares withdrawn, less his membership and withdrawal fees, if any, authorized expense fund deductions, and any other sums lawfully chargeable thereto, with interest or profits payable out of the then apportioned profits, depending for amount upon the age of the certificate therefor, as provided in the next section." Article 6, § 1.

"All withdrawals will be paid in the order of filing a notice of such intention, and the association cannot be required to pay withdrawing members, in any month, more than one-half the receipts of the loan fund that month." Article 6, § 4.

"Interest at a rate not to exceed six per cent. per annum will be· allowed upon advance payments on common installment stock for the average time." Article 9, § 5.

"By the fact of application for membership a member consents that these articles and all lawful amendments thereto and by-laws adopted in accord therewith, form a part and parcel of all contracts between him and the association and between him and all other members." Article 11, § 3.

The other sections of said articles and the other amendments do not materially affect the questions under consideration.

All persons subscribing for any of the classes of stock of the association were required to sign a written application for membership, specifying the number of shares and class of stock desired, and in which written application the applicant agreed to comply with and abide by all the terms, conditions, directions, and agreements contained in the articles of incorporation, by-laws, rules, and regulations of the association, and made the same a part of the contract with the association. The certificates issued for the several classes of stock are the same, in general form, and in the terms, conditions, and indorsements thereon, except in slight change of language. In ·case of common installment stock, the certificates certify that the person to whom the certificate is given "has subscribed for and is the owner of ——— shares of class ——— Common Installment stock therein of the par or maturity value of One hundred dollars each." In case of class E stock there is a statement on the face of the certificate in words and figures as follows: "Fully paid $———." And the certificates certify that the person to whom the certificate is given "has subscribed for and is the owner of ——— shares of Guaranteed Six Per Cent. Income stock therein of the par or maturity value of One hundred dollars each." In case of class K stock there is a statement on the face of the certificate in words and figures as follows: "Fully paid $———." And the certificates certify that the person to whom the certificate is given "has subscribed for and is the owner of ——— shares of Guaranteed Seven Per Cent. Income stock therein of the par or maturity value of One hundred dollars each." And in case of class H stock there is a statement on the face of the certificate in words and figures as follows: "Fifty dollars per share paid at date of issue." And the certificates certify that the person to whom the certificate is given "has subscribed for and is the owner of ——— shares of Prepaid Accumulative stock therein, of the par or maturity value of one hundred dollars each."

When the association went into the hands of a receiver, there were outstanding of the different classes of stock the number of shares of the par and paid-in value as follows:

| | | | |
|---|---|---|---|
| Class E | 286 48 | $    28,648 | $ 28,648 00 |
| Class F | 1 00 | 100 | 100 00 |
| Class K | 64 50 | 6,450 | 6,450 00 |
| Class H. (½ prepaid) | 123 00 | 12,300 | 6,150 00 |
| Class H. (½ prepaid but not issued) | ........ | ........ | 41 00 |
| Class J | 45 00 | 4,500 | 862 62 |
| Classes A, B, C, D, I, L, M, N | 84,523 00 | 8,452,300 | 192,873 65 |
| | 85,042 98 | $8,504,298 | $235,125 27 |

Claimants are the owners of 230.50 shares of class E stock, 8 shares of class K stock, and 43 shares of class H stock, having paid in thereon $26,000; and they have severally presented to the receiver a claim on their shares of stock, insisting that they are entitled to preference in the payment of their claims, and that their claims should be paid by the receiver in full before any payment is made on account of claims presented against the receiver on other classes of stock. The receiver denied the claim for preference, and the court appointed a referee to hear, try, and determine all questions raised by the presentation of said claims and the rejection thereof. The referee denied the appellant's claim for preference, and the report of the referee was confirmed by the court. The court also directed that the disbursements of the reference be paid by the receiver. The claimants have appealed from such order, except so far as the same directs the payment of the disbursements of the reference, and the receiver has appealed from that part of the order directing him to pay said disbursements.

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and HOUGHTON, JJ.

Fred. Greiner, for claimant Knox.

Wilson & Smith, for claimant Wilson.

Martin Clark, for claimant Cook.

Lockwood & Lockwood, for claimant Wasson.

Bertrand W. Nye, for other claimants.

Irving W. Cole, for all claimants.

Clark H. Timmerman, for receiver.

CHASE, J. A careful consideration of the articles of association leads us to the conclusion that the possible insolvency of the association was not in the contemplation of the incorporators or of the members of the association, in changing the articles of association from time to time. The articles of association seem to have been prepared with entire confidence that the somewhat intricate system of stock certificates and the numerous classes of stock would be attractive to many investors, and that money would be received and continued with the association, and so invested that the profits therefrom would not only be sufficient to pay an expense account out of all proportion to the business transacted, but also sufficient to leave a large net balance for distribution. All classes of stockholders were given the right to withdraw from the association at the times and on the terms expressly stated in the articles of association. By the express terms of the articles of association, withdrawals by stockholders (all classes) were to be paid in the order of filing notice of intention to withdraw, but the association could not be required to pay withdrawing members in any month more than one-half of the receipts of the loan fund for that month. So long as the association remained solvent, no question could ever be raised in regard to a preference in the payment of the full or withdrawal value of the different classes of stock, either while the association continued in business as an association, or in case of its dissolution. There is not a word in the articles of association in any way expressly referring to the question of the distribution of the assets of the association in case of insolvency, and nothing that, in our judgment, can be construed as having any reference to such possible insolvency. Every person having a share of stock in the association became a member of the association,

and entitled to vote on such share in person or by proxy at all meetings of the stockholders, without distinction among the classes of stockholders. Claimants were interested to a limited extent in the profits of the association, and were stockholders and members of the association. They are not general creditors of the association. In determining the withdrawal value of the several shares of stock, persons having fully paid stock were given by the articles of association a permanent, fixed, book value, while persons holding installment stock had its value for withdrawal or holding fixed as provided by the articles of association once in six months. So long as the association continued in business, therefore, the full-paid stock had a fixed value, while the installment stock had a withdrawal and holding value to be so determined.

The contract with the installment stockholders is as sacred and binding as that with the full-paid stockholders. When the association ceased to exist as an association, all contracts were equally incapable of being fulfilled; and equity now steps in to wind up its affairs, and make a ratable distribution of its assets among its members. The general principles relating to the distribution of the assets of insolvent building and loan associations is well stated in 6 Cyc. 165, as follows:

"After the ordinary costs of winding up the association are paid, interested parties occupying the position of general creditors are entitled to be paid in preference to those whose claims are founded upon the relation which they sustain to the association as members thereof, unless the irregular acts of the creditor caused the insolvency; but where the courts are inclined to treat the rights of all those holding the relation of stockholders as equal, and to allow no priorities in their claims. This is true, notwithstanding the stockholder has given notice of withdrawal, although such notice has matured, and he has received orders from the treasurer for the payment of the withdrawal value of his stock; but where the rules and by-laws of the association are held to govern the distribution in insolvency, the same as when the association was a going concern, the rule may be otherwise."

Applying the principles thus stated to this case sustains the order of the Special Term. The claimants assert that from the articles of association it should be held that it was the intention of the incorporators to give to the claimants a preference in the distribution of the assets in case of insolvency. We do not agree with the claimants that the articles of association relating to the determination of the withdrawal value of stock were intended in any way to affect the question of the distribution of assets in case of insolvency. Claimants also assert that the word "guaranteed," used in connection with classes E and K stock, must refer to the payment of the principal, in any event. It is not at all clear what, if anything, was intended by the use of the word "guaranteed" in connection with such stock. It would seem to refer to the income thereon, but, there being doubt about the income being absolutely guaranteed, the word may have been used with reference to the withdrawal value of such stock while the association continued in existence. To find that any particular class of stock should have preference in the distribution of assets in the case of insolvency, the articles of association should so state in a plain and positive manner, free from ambiguity and doubt. Questions may arise as to the withdrawal value of the several classes of installment stock at the time this action was com-

menced, but, as the articles of association do not provide how the funds shall be distributed in case of insolvency, equity requires that the withdrawal value of the stock at the time the action was commenced should be the basis upon which the assets of the association should be proportionately distributed. The following cases, among others, sustain the conclusion herein reached: Coltrane v. Association (C. C.) 110 Fed. 281; Coltrane v. Blake, 113 Fed. 785, 51 C. C. A. 457; Alexander v. Southern Home B. & L. Association (C. C.) 110 Fed. 267; Solomons v. American B. & L. Association (C. C.) 116 Fed. 679; Gibson v. Safety Homestead & Loan Association, 170 Ill. 44, 48 N. E. 580, 39 L. R. A. 202; Mutual Union Loan, etc., Association v. Stolz, 93 Ill. App. 164; Hohenshell v. Home Sav., etc., Association, 140 Mo. 566, 41 S. W. 948; Leahy v. National B. & L. Association, 100 Wis. 555, 76 N. W. 625, 69 Am. St. Rep. 945; Coltrane v. Baltimore B. & L. Association (C. C.) 110 Fed. 272; Towle v. Amer. B. & L. Association (C. C.) 75 Fed. 938; Teller v. Wilcoxen (Iowa) 81 N. W. 772; Bingham v. Marion Trust Co. (Ind. App.) 61 N. E. 29; Criswell's Appeal, 100 Pa. 488; Strohen v. Franklin S. & L. Association, 115 Pa. 273, 8 Atl. 843.

We do not think that the Special Term so abused the discretion vested in it in regard to the payment of disbursements as to require interference by this court.

The order should be affirmed, without costs to either party. All concur.